[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 129 
Appellant was indicted and convicted for the first degree murder of eighteen year old Regina Carol Quarles by strangling her. In accordance with the jury's verdict, the trial court fixed his punishment at life imprisonment in the state penitentiary. After sentencing, appellant gave oral notice of appeal and his motion for new trial was subsequently overruled.
Prior to his conviction in the case sub judice, appellant pled guilty to a two count indictment returned by the Tuscaloosa Grand Jury charging assault with intent to murder and assault with intent to ravish one Sherry Rumsey (Case No. CC-78-461, Tuscaloosa County Circuit Court). Appellant was sentenced to twenty years in the penitentiary. In addition, appellant was convicted by a jury of assault with intent to murder one Dena Fair and received an additional twenty year sentence. His conviction in that case was affirmed by this court in Hayes v. State, 384 So.2d 623 (Ala.Cr.App.), writ quashed, 384 So.2d 627 (Ala. 1980). Both of appellant's prior convictions involved stranglehold attacks on female companions late at night in a one-to-one encounter. See the facts inHayes, supra.
The crux of this appeal concerns the sufficiency of the State's evidence. Because of the number of State witnesses and the complexity of their testimony the facts of this case are necessarily involved.
The State called as its first witness in the instant case Dr. Henry Santina, a pathologist with the Department of Forensic Sciences. Dr. Santina performed an autopsy of the deceased on August 28, 1978 at the scene where the body was found and determined the cause of death to be strangulation. It was established that the deceased had been dead between twenty-four and eighty hours. Dr. Santina found a brassiere tied around the victim's neck. He also found a bracelet and three rings on the victim's body, but did not find any earrings. He did not observe any tears in the victim's ears. Dr. Santina could not determine whether the deceased had been raped; "there was no evidence of seminal fluid" (R.p. 591).
William H. Landrum, a forensic serologist with the Department of Forensic sciences, testified that he received certain items from Dr. John McDuffie, a criminalist in Tuscaloosa. Mr. Landrum examined vaginal fluid from the victim and his test results for the presence of spermatozoa and semen were negative. "[T]he skin tissue from the *Page 130 
vaginal area had undergone a high degree of decomposition; therefore, it is my opinion that no semen would have been detected if it had been there." (R.p. 615)
Mr. Landrum also examined certain brown stains collected from inside the car appellant was driving the night the deceased disappeared. The brown stains were marked for identification as State's exhibits 12 through 18. Tests revealed that all the stains were either group B, human blood in origin or that their origin as human blood or animal blood could not be conclusively determined. Two pieces of fingernail were also collected from appellant's automobile and they were group B in origin as well. Mr. Landrum stated that the fingernail and tissue samples from the deceased were consistent with group O. The deceased's fingernail samples were not recovered from appellant's automobile, nor were any of the stains inside the vehicle consistent with group O.
Sharon Phillips, eighteen years of age, testified that she and her twin sister, Karen, were best friends with the deceased. Sharon testified that the deceased came to her house in Ralph at approximately 8:00 p.m. on Friday, August 25, 1978, to borrow a rust colored blouse and a black vest. Sharon, Karen and the deceased had plans to go to the Super Market Disco later that night. The deceased went home and came back to the Phillipses' house around 9:30 p.m. The three girls departed for the Super Market at approximately 10:00 p.m. in the Phillipses' automobile. The deceased left her car at the Phillipses' where she planned to spend the night. The three arrived at the Super Market around 10:30 p.m.
During the evening Sharon saw the deceased dancing with Cary Cockrell, a high school friend, and the appellant whom she had never seen before. "That's all I saw her dance with." (R.p. 643) Sharon first saw the deceased dancing with the appellant after midnight and last saw them dancing together about 1:30 a.m. on August 26, 1978. "I was dancing on the floor right beside them, then I walked off — after the song ended, I walked off the floor and sat on the stools and Regina and this guy danced the next dance. . . . I got a good look when I was dancing and I saw him again when I was sitting on the stool." (R.p. 645, 647) Sharon identified the shirt appellant was wearing on the night in question. The last time Sharon saw the appellant he was on the dance floor with the deceased.
Sharon, Karen and the deceased decided to leave at approximately 1:45 a.m. "We all left the Super Market together and went out the door" (R.p. 648). It had been "about fifteen minutes" since Sharon had last seen appellant on the dance floor with the deceased.
Bubba Bridges, whom Sharon had met that evening, walked with the three girls to their car. "Karen got in the back seat and Regina got in the front seat and I was standing outside the door. I was going to drive, I was talking to Bubba" (R.p. 650). Over hearsay objections by defense counsel Sharon was permitted to testify that the deceased got out of the car and said, "`I got a ride home.' . . . And that they would follow us home, and she said, `If he pulls off on the side of the road, you all know what to do'" (R.p. 653). The State contended that the deceased's statements were part of the res gestae and were also a dying declaration.
Sharon last saw the deceased walk back toward the Super Market. Sharon stated that "we waited about ten minutes, then we rode around the parking lot looking for her, and when we didn't see her, we went on" (R.p. 654). Sharon testified that the deceased "had blue jeans on and rust shirt and a black vest" (R.p. 655). Sharon did not know what kind of vehicle the deceased left in. Sharon stated she was driving a white Grand Prix with a green vinyl top.
On cross-examination, Sharon testified that the statement the deceased had made, "If he pulls off on the side of the road you all know what to do," was made in a "joking manner" (R.p. 656). She didn't know whether the deceased meant for her "to stop or go on" (R.p. 656). Sharon stated that she had two drinks at the Super Market and that there were around two hundred *Page 131 
people there that night. She further stated that the appellant had "medium-length brown hair and a mustache" (R.p. 658).
On re-direct Sharon testified that she had also identified appellant from photographs given her by police officers. "[T]hey gave me a stack of pictures and I just went through them and identified him" (R.p. 662).
Karen Phillips' testimony was essentially the same as her sister's. Karen saw the deceased dancing with "Cary Crawford[1]
and a guy I didn't know" (R.p. 666). Karen described the guy she didn't know as being "dark headed" and having a mustache. "He had blue jeans on" and "looked nice" (R.p. 668). Karen testified that at 1:45 a.m. "I was ready to go and I went over to the table. I told my sister and Bubba Bridges who was sitting there, I told them I was ready to go, and Regina walked up so we left" (R.p. 669).
Again, over hearsay objections by defense counsel, Karen was permitted to testify that the deceased made the following statements from the front seat of the Phillipses' car: "`Did you see the guy I was dancing with?' I said yes. And she said, `He was good looking, wasn't he?' And I said yeah, and she hesitated for a moment like she was thinking, and she said, `I think I'll go in there and talk to him, he said he would take me to Fosters'" (R.p. 673, 674). Karen testified, without objection, that she and the deceased knew Cary Crawford very well on a first name basis, but that her words had been, "Did you see the guy I was dancing with?" (R.p. 673) The State contended once again that the deceased's statements were part of the res gestae and were also a dying declaration. To Karen's knowledge Cary Crawford had been the deceased's only other dancing partner at the Super Market besides the nice looking "dark headed guy with a mustache" (R.p. 666).
Karen then testified without objection that the deceased "got out of the car and when she got out, she said, `I've got a ride home' she said, `I'll follow you all' and as she was walking off, she said, `You all know what to do if he pulls off'" (R.p. 675). Karen last saw the deceased walking back toward the Super Market.
On cross-examination, Karen stated that she didn't observe the deceased's every movement at the Super Market, that the deceased could have talked and danced with several persons. Karen testified that she didn't know with whom the deceased left the Super Market and that she could not say that the person she saw the deceased dancing with was the appellant. Karen stated that she and Sharon rode home alone.
Edie Garrison next took the stand on behalf of the State and testified that she had known the appellant for about three years and the deceased for two years. She made a positive identification of the appellant in court. Ms. Garrison stated that she arrived at the Super Market "about nine thirty or ten" on August 25, 1978 and saw the appellant and the deceased dancing between 10:00 p.m. and 11:30 p.m. when she left. She testified that on three or four occasions she, too, danced with the appellant during the night.
Vickie Windham testified that she had known the appellant for approximately two and a half years. Ms. Windham stated that she did not know the deceased, but saw the appellant talking to a female inside the Super Market just before she left around 2:00 a.m. on the night in question. The Super Market was closing about that time and as she was leaving Ms. Windham testified that she saw the appellant coming outside with the same female. "[S]he had long dark pants, a long sleeved shirt, and short brown hair. . . . About to the collar maybe" (R.p. 691). Her hair was a "medium color brown." Ms. Windham did not see where the appellant and his female companion went.
Officer William Herder of the Tuscaloosa Police Department testified that he received a radio dispatch at approximately *Page 132 
6:00 p.m. on August 28, 1978 and proceeded to the entrance road to the Branscomb apartments off Highway 69 South. Approximately two hundred yards from the entrance to the apartments Officer Herder saw several persons pointing to the side of the road where he discovered the deceased's body. The deceased's nude body was found in a drainage ditch and was covered with grass and underbrush.
Eve Rominger testified that she arrived at the Super Market, between 8:00 and 8:30 p.m., on August 25, 1978. Ms. Rominger was with her friend, Diane Jacobs. Ms. Rominger had known the appellant between three and four years. She stated that during the evening she danced with the appellant and also saw the appellant dancing with Diane Jacobs, Edie Garrison and a "blond headed girl that sat with us." (R.p. 718) Ms. Rominger testified that she left the Super Market to go home between 12:00 and 12:30 p.m., and last saw the appellant there about 10:00 or 10:30. Ms. Rominger's mother saw her come in when she got home.
Ms. Rominger next testified that the appellant called her at work on Monday, August 28, 1978 between 9:30 a.m. and 10:00 a.m.
 "[H]e started asking me if I had heard about what happened to Regina Quarles, and I said, `Yeah, Mike, I did.' And he said, `You know, Eve, I'm gonna need an alibi for that night.' And I said, `Yes, Mike, I can understand that because of all the trouble you've been in.' Then he started — he asked me if I had seen him anymore that night before I left and I told him no, that I didn't. He started telling me he took this blond headed girl home in Forestasia and that he let her out about three or four houses before her house and he couldn't remember her name, that after that he asked me if I'd be his alibi for that night. At first I told him yes and we kept talking about everything and I said, `Mike, I can't be your alibi.' I said, `My mother was up when I got home that night and she knew what time I got home.' Then he mentioned wasn't there any way I could sneak out of the house, and I told him no, I didn't have to do anything like that. . . .
. . . .
 The last thing that he told me was that he got home at six o'clock that morning and that he knew that he was going to need an alibi." (R.p. 720-721)
During the conversation Ms. Rominger told the appellant that "he had danced with a blond headed girl that night, you know, with black leather pants and a black leather vest" (R.p. 723). At the time the appellant called Ms. Rominger the deceased's body had not been found, she was still reported missing.
On cross-examination, Ms. Rominger stated that she was around the appellant "pretty much" all night while at the Super Market and that she did not see him dancing with the deceased. Ms. Rominger had found out that the deceased was missing on Saturday, August 26, 1978, from the deceased's cousin. During her Monday morning conversation with the appellant, Ms. Rominger testified that he asked her the name of the "blond headed girl" he had danced with at the Super Market. She could not remember. Ms. Rominger was aware that the appellant "had been in a lot of trouble" about "other incidences" at the Super Market (R.p. 727). Ms. Rominger stated that she didn't know the deceased personally, but knew her when she saw her.
Mrs. Peggy Hayes, the appellant's mother, testified that the appellant was twenty-three years old and was living at home with herself and her husband on August 25, 1978. Mrs. Hayes stated that the appellant left their house that Friday night around 10:00 in her 1975 Mustang. Mrs. Hayes identified the shirt appellant was wearing that night and stated that the police officers, who searched her house with a search warrant, found the shirt in a suitcase under the baby bed in appellant's bedroom. She stated that the appellant stayed in bed "the whole weekend, he was sick with throwing up and diarrhea" (R.p. 741). The appellant went to work Monday morning, but had to be picked up around 9:30 a.m. to 10:00 a.m. because *Page 133 
he was still sick. Mrs. Hayes next identified a heart shaped, black onyx earring with a small diamond chip for pierced ears. Mrs. Hayes discovered the earring, State's exhibit number 20, in the back-seat floorboard of her Mustang on Tuesday or Wednesday after the deceased's body was found on Monday. Mrs. Hayes admitted that the appellant had used the car on Friday night and that she had never seen the earring before. Mrs. Hayes did not tell the appellant about finding the earring, but turned it in to Homicide. Mrs. Hayes testified that the appellant had group B blood.
On cross-examination, Mrs. Hayes testified that her entire family had group B blood. She stated that her husband had bled inside the car on several occasions. "Everytime he bumps his hand or arm or something, he bleeds, and everytime he tries to clean the car up or fool with the car, he's always bleeding" (R.p. 750). In addition, Mrs. Hayes stated that her dog, Preacher, had been in two recent "dog fights" and had "bled all over the car" (R.p. 750) on several occasions. Mrs. Hayes further testified that she could not be sure the earring she found was the same one she identified on direct examination. "The only thing that I can say positive is that it looks like the earring I got out of the car" (R.p. 756).
On re-direct examination, Mrs. Hayes testified that the earring did not belong to her daughter.
Mrs. Irma Quarles, the deceased's mother, testified that she saw her daughter Friday evening before she left for the Phillipses' home. The Quarles lived in the Fosters community of Tuscaloosa County. "She left early in the night, I would say about eight o'clock and then she came back home and dressed" (R.p. 766). Mrs. Quarles stated that her daughter "had on dress blue jeans and a rust long sleeved blouse and a [black] vest. . . . She was wearing the necklaces that she usually wore and the black earrings, I'm sure she had the black earrings because she had on a black necklace that matches. . . . [T]hey were black, little heart-shaped earrings and the necklace had little diamonds in it. . . . It was Sarah Coventry jewelry" (R.p. 766-767). Mrs. Quarles next identified State's exhibit number 20 as the earring the deceased was wearing.
Mrs. Quarles explained that she had received the earrings for hosting a Sarah Coventry party in her home approximately two weeks before the deceased was killed and had given them to the deceased as a gift. "I'm sure she was wearing it because she wore matching things and I'm sure she had it on with her black necklace" (R.p. 768). Mrs. Quarles testified that she had since gone through all the deceased's jewelry and that the earrings and matching necklace were missing.
On cross-examination, Mrs. Quarles admitted that she did not actually see the deceased wearing the earrings. "Her hair was so long it covered her ears, but she always wore matching jewelry" (R.p. 770). Defense counsel presented Mrs. Quarles with a matching earring to State's exhibit number 20 which Mrs. Quarles believed at first to belong to her daughter. When questioned further whether, in fact, it was her daughter's, Mrs. Quarles responded, "Well, I guess not for sure, I'm sure she had hers on and I feel like those are hers" (R.p. 772). The matching earring presented by defense counsel was admitted as defense exhibit number one.
Deputy Don Lake of the Tuscaloosa County Sheriff's Department testified that he talked to the appellant at approximately 4:00 p.m. on September 5, 1978, in the presence of his attorney and Sergeant Shirley Fields. Deputy Lake advised appellant of his constitutional rights and took appellant's signed statement, which was voluntarily given. Deputy Lake was allowed to ask the appellant questions concerning events which transpired after the daylight hours on August 26, 1978, but not about events transpiring between midnight and 6:00 o'clock on the 26th.
Appellant was first shown a picture of the deceased whom he failed to recognize either by face or name. Appellant then stated that on arriving home on August 26 *Page 134 
he "stayed in bed until around five or six" Saturday evening and stayed at home Saturday night. Appellant stated that he played golf Sunday afternoon with his father, Jim Taylor and Jim Cherry and that he stayed home Sunday night. He further stated that he left work early on Monday morning because he was sick (R.p. 789).
Deputy Lake testified that the appellant was arrested and taken into custody on September 8, 1978, the day an earring was voluntarily retrieved from defense counsel. Sergeant Fields, assistant district attorney Tommy Smith, Mrs. Hayes, and the appellant were present when the earring was handed over. Deputy Lake had another conversation with the appellant on September 8 after 4:00 p.m. in the Tuscaloosa County Jail I.D. room. Only Officer Lake and the appellant were present during the conversation. Officer Lake again advised the appellant of hisMiranda rights and the appellant indicated his desire to make a voluntary statement. Officer Lake then took appellant's written statement.
Outside the presence of the jury it was ascertained that defense counsel came by Deputy Lake's office around 10:00 a.m. on September 8. "Mr. Prince indicated to me that he would like for me or for Homicide Unit to check out Mike's alibi for him, that he felt like we would be able to get more done. . . . He briefly related to me, outlined to me what Mike's alibi was, and I stated that there could be some substance to it, that he needed to be more detailed, that he and I needed to talk with Mike . . . . if he wanted to substantiate an alibi. . . . I asked him if he had any objections to me talking with Mike. . . . He said no so long as we specifically limited it to his alibi and talked about nothing else" (R.p. 800-801). Deputy Lake testified that he specifically confined his interview with the appellant to the appellant's alibi "for the night of August 25, 1978" and "in the early A.M. of August 26, 1978" (R.p. 801).
The appellant's September 8 statement to Deputy Lake reads as follows:
 "Mike stated he left the Super Market some time after twelve midnight on August 26, 1978, accompanied by a white female, 24, 25 years of age, with longer than shoulder-length blond hair which was of the Farrah Faucett fluffed up style. He stated she was five-six to five-eight tall, weighed 115 to 120 pounds. He stated she possible (sic) had blue eyes. He stated she was wearing all white clothes, jumpsuit, long dress, or blouse-pants combination. Mike stated that he didn't remember dancing with the girl during the night or not because he danced with so many. He stated she came up to him and asked if he would take her home and he asked where she lived. He stated she told him she lived in Forestasia and he told her okay because it was close to where he lived. He stated the girl came there with friends and she told him that she had to go tell them what she was going to do. He stated she left him then and was gone somewhere, either inside or outside the Super Market for a short time, five minutes at the longest. Mike stated the girl seemed to be in a hurry to leave the club. He stated they left the club together, but he doesn't remember anyone who may have seen them leave the club. He stated that when they started to get in his Mustang, he made the statement that it is small, but it'll get us to where we want to go. She replied something to the effect of yeah, I know, I've got a Grand Prix. He stated they got into his car and went straight to Forestasia by the route of Greensboro Avenue, Skyland Boulevard, and Hargrove Road, then left into Forestasia at the girl's direction. He stated she directed him through Forestasia to the circle at Woodland Forrest Road, then directed him up the hill toward the clubhouse. He stated that on the way through Forestasia, she did not point out which house she lived in or even look at any particular one. He stated that on the Woodland Forrest Road, he said this is not Forestasia and she said just pull on around here, indicating the Woodland Forrest clubhouse. He stated they pulled on around the clubhouse and parked on the pavement between it and the swimming *Page 135 
pool. He stated they talked a little, but he doesn't remember any particular thing they talked about. He stated he didn't get the impression that she was married or divorced. He stated that he had sexual intercourse in the backseat of his Mustang and she was very cooperative. He stated that neither of them ever got out of the car during that time. Mike stated that he remembers a couple of cars passing the clubhouse on the Woodland Road, but no one came around where they were parked. He was asked by Investigator Lake to try to remember what the girl was wearing since he had to undress her before sexual intercourse, and Mike stated that he still couldn't say what it was for sure, but it seemed as if he only had to take off one piece of clothing before the act. He stated that it was early on Saturday morning when they left the clubhouse and when they got to the circle going back into Forestasia, and she said let me out here, I'm not supposed to be out this late and I've got to sneak in. He stated she never mentioned her parents, but he just assumed that's who she had to sneak by. He stated he let her out where the circle begins, from the clubhouse, and drove off going the same way he came in. He stated he didn't see which way the girl went in.
 He stated that Eve Rominger was at his table that night and that after the Quarles girl came up missing, he went to her and asked if she knew the girl he left with. He stated that because of what had happened to him before, be believed he would be questioned by the police and he wanted an alibi. He stated that Eve told him the only blond girl she remembered being around the table was a girl named Linda, Belinda, or Melinda, but she didn't know her last name.
 Mike also drew a small diagram depicting the area where he let the girl out of his car, one of inside the Super Market club depicting his location when a girl approached him about taking her home." (R.p. 804)
Defense counsel Robert Prince testified that he could not remember giving Deputy Lake permission to interrogate or interview the appellant outside his presence. "I remember having a conversation with Mr. Lake concerning the alibi of Mike Hayes and that we had checked her alibi — his alibi out and the people were not cooperating, if homicide unit wanted to help, they could go help us check some of these people out. I have that conversation, the exact wording I do not remember" (R.p. 809). Mr. Prince stated that he asked the homicide unit on three occasions to check out the appellant's alibi and that he was "still trying to find that girl" (R.p. 813). Defense objected to the September 8 statement being admitted and specifically the details concerning sexual intercourse. The objection was overruled and the statement was admitted and read into evidence in the presence of the jury.
Deputy Lake testified that the Homicide Unit subsequently checked out the appellant's alibi and located the "Melinda" mentioned in his statement. Pursuant to a warrant Deputy Lake also located the shirt appellant was wearing at the Super Market in a suitcase under a baby bed in appellant's bedroom.
On cross-examination, Deputy Lake was questioned concerning the heart-shaped black onyx earring he had looked for in his investigation. The officer admitted "there's no way to tell who put that earring in the Hayes car" (R.p. 836).
Sergeant Shirley Fields of the Tuscaloosa Police Department testified that he was the first Homicide Officer to arrive on the scene where the deceased's body was found. He stated the body was located ten feet from the pavement on the roadway entrance to the Branscomb apartments approximately two hundred yards off Highway 69 South in Tuscaloosa County (R.p. 842). Sergeant Fields made photographs at the scene and received three rings and a bracelet which were recovered by Dr. Santina at the time of the autopsy. No other jewelry was found on the body.
Sergeant Fields also participated in a search of appellant's automobile on September *Page 136 
6, 1978 at the Tuscaloosa County Homicide Unit. He was present when photographs of appellant's automobile were made. The photographs were numbered State's exhibits 25 through 30 and were admitted over objection. Of the six photographs introduced, four depicted reddish-brown stains, which appeared to be blood stains, located on various parts of the automobile's interior and exterior. Sergeant Fields testified that he took various samples of the reddish stains and turned them over to Investigator Wayne Murphy.
On cross-examination, Sergeant Fields testified that the September 6 automobile search took "almost six hours" and that he covered the car "pretty thoroughly" (R.p. 873). Officer Fields admitted none of the blood samples he took from the car indicated group O blood.
On re-direct Sergeant Fields stated that he received State's exhibit number 20, the earring recovered from appellant's car, from Deputy Lake. Sergeant Fields further testified that he discovered a link to a chain in appellant's car and that a broken necklace chain, State's exhibit 32, was found near the deceased's body (R.p. 880). A second search of appellant's car of approximately one hour was conducted.
On re-cross Sergeant Fields testified that the broken necklace chain found near the deceased's body had smaller links than the link discovered in appellant's car (R.p. 882). Sergeant Fields stated that Homicide kept the appellant's car in custody for a month and a half after the second search.
Wayne Murphy of the Tuscaloosa County Sheriff's Department testified that he, too, participated in the search of appellant's vehicle. Investigator Murphy stated that he received the broken necklace, State's exhibit 32, from the deceased's father on September 5, 1978. He turned the necklace over to Sergeant Fields. In addition, Investigator Murphy received State's exhibit 12 through 18 from Sergeant Fields and turned them over to Dr. John McDuffie of the Tuscaloosa laboratory.
On cross-examination, Investigator Murphy stated that the gold link found inside appellant's car "didn't fit any chain or anything else" and could not be connected with the deceased's death (R.p. 892). Defense counsel moved to exclude the testimony concerning the link and the trial court reserved its ruling.
Dr. John R. McDuffie, a criminalist for the Department of Forensic Sciences, testified that he received State's exhibits 12 through 18 from Wayne Murphy of the Tuscaloosa County Homicide Unit and that he sent them to William H. Landrum at the Auburn laboratory (R.p. 919, 920). These exhibits were the samples of reddish brown stains collected from appellant's automobile which Mr. Landrum determined were either group B human blood or else blood of an undetermined origin. State's exhibits 12 though 18 were then introduced over objection. Dr. McDuffie further stated that he was unable to obtain any fingerprints from the deceased.
On cross-examination, Dr. McDuffie testified that he could not determine whether any of the fingerprints or hair samples found in appellant's car were those of the deceased.
Mrs. Betty Johnson testified that she was a regional manager with Sarah Coventry Jewelry. She stated that State's exhibit 20 first became part of the Sarah Coventry line in January of 1978. The item appeared in the January and April catalogues, but was not in the August, 1978 catalogue. Mrs. Johnson stated that a dock strike had caused a "stop sales" to be issued on the item for "almost all the time we've had it." Mrs. Johnson had sold three pairs of the earrings. Two pairs were sold to a Mrs. Holcomb of defense counsels' law firm in October, 1978, and February, 1979. The third pair was sold to "a girl in Berry" in January, 1979 (R.p. 948). Mrs. Johnson further explained how Sarah Coventry jewelry could be ordered through home demonstrations.
On cross-examination, Mrs. Johnson stated that the earrings were "popular, but we just haven't sold that many" (R.p. 951). She further stated that the earrings could *Page 137 
be ordered without having a home demonstration by calling a hostess or branch manager. Mrs. Johnson had no idea now many pairs of the earrings had been sold since they came out in the Tuscaloosa area.
Mrs. Martha Beam testified that she worked under Mrs. Johnson, her regional manager. Mrs. Beam had sixteen fashion show directors who worked under her. Her records indicated that two pairs of the earrings in question had been sold through her branch between January and September of 1978. Mrs. Beam had sold one pair to the deceased's mother and her fashion director Susan Collins had sold another pair to Charlotte Sherrill.
Mrs. Susan Collins testified that she was employed by Sarah Coventry during 1978 and that she had received an order for the earrings from Charlotte Sherrill. A "stop sale" had prevented the delivery of the earrings and Ms. Sherrill's money had been refunded (R.p. 962).
On cross-examination, Mrs. Collins had no idea how many pairs of the earrings had been sold in Jefferson, Greene or Hale counties.
Sergeant Fields resumed the stand and testified over objection that he observed a superficial mark three quarters of an inch in length that had "scabbed over" on the appellant's right arm on September 5, 1978 (R.p. 966). He further stated that the fingernails of the deceased were "very short, down to the — past the finger" (R.p. 967).
Twenty one year old Melinda Wade Harris testified that she arrived at the Super Market on August 25, 1978, around 8:00 or 8:30 p.m. Her hair was "long blond" and she was wearing black pants with a black top (R.p. 980). Mrs. Harris recalled dancing with the appellant twice, but did not leave with him. Mrs. Harris testified that she left the Super Market around 1:00 a.m. with a girl friend, Lisa Patterson, and Rocky Townsend, and a friend of his. The four traveled to the Stardust Club. "Me and Lisa went in my car, started in my car and stopped because I wasn't able to drive, and so I let the friend of Rocky's drive my car and I rode with Rocky" (R.p. 981). Mrs. Harris stated that they "signed in" at the Stardust, "danced and had a few drinks and then we left. We rode over in Rocky's car to a friend of his and we sat and listened to some records, had a few drinks, and then he took us back to my car" (R.p. 983). Mrs. Harris stated that she got home around "four, maybe later" and was with Rocky Townsend the entire time.
Mrs. Harris testified that she had been at the Super Market the prior weekend also and had been dressed in white pants with a cream colored top. On that occasion she had danced with the appellant "quite a few times" and left the Super Market with him. Mrs. Harris stated that she and appellant had ridden in her Cutlass automobile and had parked near a cemetery on Clements Road for an hour and a half. After parking she took the appellant back to his car at the Super Market around 3:30 a.m. They did not go near the neighborhood of Forestasia in Tuscaloosa (R.p. 986).
On cross-examination, Mrs. Harris admitted she was married, but legally separated, when she went out with appellant and that she had sexual relations with him at the cemetery. Mrs. Harris testified she had never met the appellant before that night and "didn't know him," but that he was a "perfect gentleman" and was "considerate" as to her feelings during the sexual relations (R.p. 989). When asked whether the appellant pulled her clothes off, Mrs. Harris replied, "I have a habit of doing it myself" (R.p. 989). Mrs. Harris stated that it was not "unusual at all" and "was more or less a custom" for boys and girls to meet at the Super Market and "go out and have sex relations" (R.p. 993). Mrs. Harris testified that she got home in the morning and had had sexual relations with the appellant between 4:00 and 5:00 a.m. (R.p. 996). In addition to consuming alcohol, Mrs. Harris said she was stimulated by marijuana. She did not go out with the appellant a second time.
On redirect examination, Mrs. Harris testified that the appellant had also used marijuana the night she was with him (R.p. 998). *Page 138 
Twenty year old Claude "Rocky" Townsend testified that he arrived at the Super Market on August 25, 1978, with a friend, Ron Voight, and met Melinda Wade Harris. "She come asked me to dance" (R.p. 1002). Mr. Townsend testified that he danced with Mrs. Harris on more than one occasion during the evening. "She had a black silk outfit on with no back in it" and had "sort of Farrah Faucett style" hair down "to the middle of her back" (R.p. 1002). Mr. Townsend saw Mrs. Harris dancing with someone else before she danced with him, but didn't know if it was the appellant or not.
Mr. Townsend testified that he left the Super Market with Mrs. Harris around 12:00 p.m. and went to the Stardust Club where they stayed about "an hour at the most" (R.p. 1005). He next took Mrs. Harris to his apartment where they stayed until about 4:00 a.m. Mr. Townsend testified that he then "took her back to her car" at the Stardust Club. "It was getting close to five because when I got back to the apartment my buddy was getting up and going to work" (R.p. 1006).
On cross-examination, Mr. Townsend testified that he had never met Mrs. Harris before that night and did not know her last name. He stated he had sexual relations with Mrs. Harris at his apartment. Mr. Townsend further stated that he knew the deceased "by her face, I had not danced with her that night" (R.p. 1021).
Investigator Wayne Murphy was recalled and testified that he was familiar with the Forestasia area of Tuscaloosa and was in the neighborhood during the weeks of September, 1978, trying to locate "a white female, blond hair, approximately in her twenties, by the name of Linda, Melinda, Belinda" (R.p. 1030). Officer Murphy conducted a house to house investigation and located a Linda Hayes, a Linda Watson and a Belinda Turner. Linda Hayes was thirty-two years of age, had blond hair and drove a blue Gran Prix. Linda Watson was approximately thirty years of age, had long brown hair and drove a Mercury Cougar. Belinda Turner was sixteen years old and did not have an automobile.
On cross-examination, Officer Murphy testified that altogether he checked twelve houses and that there were approximately twelve more houses within three blocks of Forestasia. He checked every house in Forestasia and several leading into Forestasia from Hargrove Road.
At the conclusion of Officer Murphy's testimony the State rested its case and the appellant moved to exclude the State's evidence. The trial court found the State's evidence sufficient and overruled the motion. The appellant next moved for a mistrial and this motion, too, was denied.
The defense then called as its first witness Mickey Wilson. Wilson testified that he saw the deceased twice at the Super Market on the night in question, one time around 10:00 p.m. and a second time when he was fixing to leave. At 10:00 p.m. Wilson saw the deceased "talking to some people" in front of the door; "there were a couple of girls and I think there were one or two boys there" (R.p. 1055). Wilson described one of the boys as "kind of a black headed fellow with a mustache and he was kind of big. . . . I got pretty close to the boy because he knocked the drink out of my hand" (R.p. 1055, 1056). Wilson testified that he was later shown a picture of the appellant and that he was not the boy that bumped into him.
Wilson stated that as he was going to the front of the Super Market, getting ready to leave around 2:00 a.m., he saw the deceased "come in from outside. . . . I was standing there and I saw her pass by me then somebody caught my attention, they wanted to talk to me and I was talking to them and then she walked back out" (R.p. 1057). Wilson testified that he then walked outside to his truck, pulled the truck around front, and waited approximately thirty to forty minutes for a friend who was going to ride home with him. Around 2:30 a.m. Wilson saw the deceased walk past his truck unaccompanied. He did not see her again.
On cross-examination, Wilson testified that he did not know the deceased by name, but had seen her "once or twice" and *Page 139 
recognized her from a picture he had been shown "the night after she came up missing" (R.p. 1049). Wilson stated that the deceased "was wearing blue jeans, she had on a vest and a long sleeved shirt" (R.p. 1059).
Wilson stated that the one particular boy the deceased was talking with around 10:00 p.m. appeared to be "with the group that she was with" (R.p. 1061). Wilson further testified that when he was fixing to leave around 2:00 a.m. he saw the deceased walk into the lounge, go outside, come back inside and walk back into the lounge. The deceased was outside for four or five minutes. Wilson stated that when the deceased later walked past his truck it looked like she was "going toward some cars," but he didn't see a car pick her up (R.p. 1066). "It didn't seem like there was anybody around her when she came out" (R.p. 1068).
Wilson admitted that he didn't know the appellant, had only seen a picture of him and didn't see him at the Super Market that night.
On re-direct examination Wilson testified that he had received threats concerning his testimony, that he received a phone call saying "to stay out of the mess down at the Super Market or I would get in pretty bad trouble" (R.p. 1073). He received the call after appellant was arrested.
On re-cross Wilson stated that he reported the call to Shirley Fields and received no further calls.
Mr. Timothy Terry, Jr. testified that he visited in the Hayes home between 5:30 and 9:00 p.m. on August 26, 1978, and saw the appellant briefly. He stated the appellant was not feeling well.
Ms. Patsy Thompson stated that she visited in the Hayes home Sunday afternoon, August 27, and that appellant was asleep on the couch.
Mr. Jerry Taylor testified that he saw the appellant around 10:00 a.m. on August 28 at the Hayses' residence and that appellant was "half asleep, half awake" (R.p. 1082). He did not remember whether he played golf with appellant on August 27 or not.
On cross-examination, Mr. Taylor testified that he discussed with appellant "the lady that was missing from the Super Market. . . . [W]e were both concerned, you know, that they might question Mike on it" (R.p. 1087). Mr. Taylor testified that the appellant told him he had left the Super Market with a girl that night, had gone parking with her "up around the country club and stayed most of the evening" (R.p. 1089). The appellant didn't mention her name; "it was a girl he'd never been out with before, you know, and he really didn't know how to get ahold of her again. . . . [H]e just mentioned, you know, that she was an average looking girl with long blond, you know, fluffy hair" (R.p. 1090).
On re-direct examination, Mr. Taylor stated that appellant lived about a mile and a half from the Woodland Forrest Country Club. During his Monday morning visit Mr. Taylor did not observe any scratches or nicks on appellant's face, but did see a small scratch on his arm. "It looked like it was old because, you know, the scab was just about gone" (R.p. 1098).
On re-cross Mr. Taylor said that appellant mentioned the name Linda, Belinda, or Melinda as the name of the girl he was with "most of the night" during the early hours of August 26 (R.p. 1099). The appellant mentioned that he let her out around Forestasia (R.p. 1100).
Mr. Jim Hayes, the appellant's father, testified that on occasion he had bled on the family's 1975 Mustang prior to the time appellant drove it August 25, 1978. He testified that the family dog had also bled in the car. Mr. Hayes stated that appellant was too sick to play golf with him Saturday, August 26, and Sunday, August 27. Mr. Hayes further stated that appellant was "not in the best of condition" when he left for work Monday morning (R.p. 1122).
Mr. Hayes admitted he talked with appellant about the deceased Tuesday after her body was found Monday.
Mr. Phillip Hamner, appellant's brother-in-law, testified that he was in the Hayes' home the weekend of August 25, 1978, and saw the appellant at supper Friday night *Page 140 
around 9:00 p.m. Mr. Hamner stated that appellant "seemed to have an upset stomach" during the weekend (R.p. 1130).
On cross-examination, Mr. Hamner testified that appellant left after supper Friday night around 10:00 p.m. Mr. Hamner stated that the appellant was home Saturday morning when he awoke around 8:00 or 9:00 a.m. "[H]e was in the living room when I got up with Chris" (R.p. 1131). Mr. Hamner testified that when his wife got up the appellant "went back to his bedroom and went to bed" (R.p. 1132).
Mr. Luther Quarles, the deceased's father, testified that he went to the Super Market Saturday morning looking for his daughter following her disappearance Friday night. He asked several people had they seen his daughter and showed them a picture of her.
Mrs. Hayes, appellant's mother, was called by the defense and testified that her family, including appellant, returned home from supper on August 25, 1978, around 9:30 p.m. The family had eaten out following a wedding. Mrs. Hayes testified that her grandson had on one occasion bumped his nose on the dashboard of her Mustang and bled in the car. He had group B blood.
Mrs. Hayes testified on cross-examination that the appellant did not go out Saturday night or Sunday, and had to return home from work Monday morning because he was still sick. Mrs. Hayes stated that the deceased's name was first mentioned in her household on Monday night (R.p. 1152). Mrs. Hayes testified that to her knowledge the appellant could not have found out about the deceased's death through the Tuscaloosa News because "we don't take the paper" (R.p. 1152). Appellant did not tell her he had called Eve Rominger Monday morning.
Mr. Sidney Hardy, a law clerk for defense counsels' law firm, testified that he conducted certain investigations in regard to appellant's case. He investigated the Forestasia area of Tuscaloosa "attempting to find a blond headed girl with whom Mike Hayes had been out in that neighborhood on the night of August 25" (R.p. 1162). Mr. Hardy found three blond headed ladies in the neighborhood, one of whom drove a Grand Prix. Mr. Hardy went to the neighborhood four times during a three-week span and checked between ten and fifteen houses.
On cross-examination, Mr. Hardy testified that he never found anyone who had been out with appellant in the Forestasia neighborhood. He was able to locate Melinda Wade Harris and ascertained that she had been out with appellant. Mrs. Harris was the only person with long blond hair Mr. Hardy found that had been out with appellant (R.p. 1172). Mrs. Harris lived in Cottondale, not Forestasia. Mr. Hardy did not go back to Forestasia after talking with Mrs. Harris.
The appellant next took the stand in his own behalf and denied killing the deceased.
On cross-examination, the appellant admitted he had pled guilty to a two count indictment charging assault with intent to ravish and assault with intent to murder on November 27, 1978, and had been found guilty by a jury of assault with intent to murder in a separate case on November 20, 1978. Appellant testified that he went to the Super Market on August 25, 1978, and to his knowledge did not dance with the deceased. "I know I danced with Eve Rominger, Diane Jacobs, Edie Garrison, I think I danced with Vickie Windham, and I danced with some other people" (R.p. 1181, 1182). Appellant denied dancing with Melinda Harris at the Super Market or having even seen her that night or the prior weekend, or having ever seen Mrs. Harris before his trial (R.p. 1182).
Appellant did not know the name of the girl with whom he left the Super Market the morning of August 26. He thought she was wearing white. "She had kind of long blond hair, kind of in the Farrah Faucett style" (R.p. 1184). Appellant stated that the girl asked him to take her home in Forestasia. He further stated that "she had to tell her friends" before they left (R.p. 1185). A couple of minutes later the *Page 141 
girl returned, "grabbed ahold of my arm and said, `Come on, let's go'" (R.p. 1192). Appellant said he walked outside with her and didn't attract anyone's attention to his knowledge (R.p. 1193). The girl told appellant she drove a Grand Prix and lived in Forestasia "about a mile or two from where I lived" (R.p. 1196).
Appellant stated that he drove into Woodland Forrest at the girl's direction and parked beside the clubhouse instead of going to Forestasia (R.p. 1199). "We sat there and talked for a little while, listened to the radio" (R.p. 1200). Appellant stated he had sexual relations with the girl twice that night, but never asked the girl her name or telephone number (R.p. 1209). Appellant said he had never taken any earrings off a girl before he "made love . . . unless they were real big" (R.p. 1210). Appellant said that when they drove toward the Forestasia circle, the girl told him "she had to sneak in, just stop and let her out" (R.p. 1215). Appellant did not see which way she went when she got out. He just "pulled off" (R.p. 1216).
Appellant admitted he was sick most of the weekend and that he first found out the deceased was missing when he went to work Monday morning. Appellant said he called Eve Rominger to find out if she knew the name of the girl he had been with that night. "She told me she didn't know for sure, but she thought it might be Melinda or Belinda or Linda, something like that" (R.p. 1224). Appellant stated he had left the Super Market the previous weekend with Kathy Wilson (R.p. 1226). At the conclusion of appellant's testimony the defense rested.
As stated previously, the crux of this appeal concerns the sufficiency of the State's evidence. In reviewing the action of the trial court in overruling a motion to exclude the evidence, only the evidence before the trial court at the time the motion was made can be considered. James v. State, 351 So.2d 693
(Ala.Cr.App. 1977); Livingston v. State, 44 Ala. App. 559,216 So.2d 731 (1968). The standard of review is whether there exists legal evidence before the jury, at the time the motion was made, from which the jury could by fair inference find the accused guilty. Stewart v. State, 350 So.2d 764 (Ala.Cr.App. 1977). In deciding this question we are required to view the evidence presented in the light most favorable to the State.Bass v. State, 55 Ala. App. 88, 313 So.2d 208 (1975).
 I.
Before deciding whether the State's evidence was sufficient to establish a prima facie case, we must first resolve the threshold question whether the deceased's statements to Sharon and Karen Phillips at the time the three were about to leave the Super Market were properly admitted over appellant's hearsay objections. We hold that they were, based on long standing authority, and that no error resulted from the admission of this testimony.
To quickly summarize the crucial facts, Bubba Bridges, Sharon and Karen Phillips and the deceased walked outside the Super Market around 1:45 a.m. The three girls were preparing to go home and were seated in the Phillipses' car which was parked in the parking lot. The deceased had last been seen dancing with appellant around 1:30 a.m. As the three girls were seated in the car, preparing to leave, the deceased made the following remarks: "Did you see the guy I was dancing with? . . . He was good looking wasn't he? . . . I think I'll go in there and talk to him, he said he would take me to Fosters. . . . I got a ride home. . . . I'll follow you all. . . . If he pulls off on the side of the road, you all know what to do." The deceased then left Bubba, Sharon and Karen and was last seen walking back toward the Super Market.
As previously stated, appellant made strenuous hearsay objection to the deceased's statements, but was overruled. The State contended the statements were part of the res gestae and were also dying declarations.
Clearly, the deceased's statements constituted hearsay. Our Supreme Court in Prince v. Lowe, 263 Ala. 410, 82 So.2d 606, *Page 142 
609 (1955) lists three authorities which have defined hearsay:
 "In Jones on Evidence, Civil Cases, 4th Ed. Vol. 1, p. 297, it is said: `By hearsay is meant that kind of evidence which derives its value, not solely from the credit to be attached to the witness himself, but also in part because of the veracity and competency of some other person from whom the witness may have received the information.'
 In Wigmore on Evidence, 3rd Ed. Vol. 5, § 1362, we find: `It is sufficient to note that the Hearsay rule, as accepted in our law, signifies a rule rejecting assertions, offered testimonially, which have not been in some way subjected to the test of cross-examination.'
 Wharton, Criminal Evidence, 11th Ed., § 427, says: `Hearsay evidence may be defined as that kind of evidence which does not derive its value solely from the credit to be given to the witness himself, but rests, also, in part, on the veracity and competency of some other person.'"
A good definition of hearsay is also found in McCormick onEvidence 584 (1972):
 "Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter."
As stated in C. Gamble, McElroy's Alabama Evidence § 242.01 (1) (3rd Ed. 1977):
 "The opportunity to cross-examine the witness is one of the major reasons for the hearsay rule. It has been held that the real value of cross-examination of a witness is the opportunity to test his (1) perception, sometimes called knowledge or opportunity to observe; (2) recollection, sometimes called memory; (3) narration, sometimes called accuracy; and (4) sincerity, sometimes called veracity."
Hearsay evidence, however, is not inherently inadmissible unless it is patently inadmissible for any purpose, Small v.State, 348 So.2d 507 (Ala. 1977), and there are many exceptions to the general rule. Two such exceptions were mentioned by the State at the time the deceased's statements were admitted, the dying declaration and res gestae exceptions.
Without question, the deceased's statements were not dying declarations. As is stated in C. Gamble, McElroy's AlabamaEvidence § 248.01 (1) (3rd Ed. 1977):
 "A dying declaration is a statement by a person who believes that his death will certainly occur soon. He must be gripped by that despair of life which is naturally produced by an impression of almost dissolution, a dissolution so near as to cause all motives of falsehood to be superseded by the strongest inducements to strick accuracy. It has been said that the declarant, when making the statement, must have been in settled, hopeless expectation of impending death."
Certainly the deceased's statements do not fall into this category.
The other exception referred to is the res gestae exception. One of the cases cited by the trial court, on which it based its ruling to admit the deceased's statements, was Cook v.Latimer, 279 Ala. 294, 184 So.2d 807 (1966) which concerns this exception.
In Cook, supra, a civil suit to recover damages for personal injuries, the evidence objected to was given by a witness who was present at the Latimer (deceased's) residence on the evening of the accident before Cook and the deceased left on their trip to Troy. The substance of the evidence was as follows from the Supreme Court opinion:
 "The two boys came into the room where the witness was visiting Mrs. Latimer. Walter Latimer, Jr., asked his mother if he could go to Troy with appellant. Mrs. Latimer first refused permission for Walter to go because he had been ill. Appellant told Mrs. Latimer that he and Walter were going in appellant's car and that appellant would drive. Mrs. Latimer then gave Walter permission to go on the trip.
 As already noted, there was a dispute as to which of the boys was driving at the *Page 143 
time of the accident. This evidence obviously related to that issue. This court has held that `[w]hat a person says on setting out on a journey, or to go to a particular place, explanatory of the object he has in view in so setting out, is res gestae evidence, and may be proven; and the jury may give it such weight as they think it is entitled to.' [Citations omitted].
 The statement here in question was made by appellant on setting out on the journey and is explanatory of the journey. It was, therefore, admissible as res gestae evidence." 184 So.2d 810.
One of the cases cited as authority in Cook, supra, and which is more on point with the instant case, is Thornton v. State,253 Ala. 444, 45 So.2d 298 (1950). In Thornton, supra, involving a conviction for first degree murder, the deceased made the following statements to his wife in the privacy of their home just before leaving for the defendant's house:
 "He tole (sic) me he was going to Mr. Thornton's house. That he had loaned him $700 to buy some whiskey Mr. Thornton was to take from a relative, and after he let him have the money, within thirty minutes afterwards, he was sorry he did. He said he didn't want to get mixed up in it and said, `I am going over there and stay around a while and if they don't bring it in, I am going to try to get my money back and not have any more to do with it. Don't let anybody know about it and be sure not to let my Daddy know about it. * * *.' He said `Mr. Thornton promised to pay him the $700.00 and give him $300.00 if he would help him out and let him have the money.'" 45 So.2d at 298, 299.
On appeal, the defendant in Thornton, supra, alleged that "the testimony given by the deceased's wife as to the statements made by the deceased to her as he was preparing to start on the journey from their house to the house of defendant, admitted over his objections, were illegal, hearsay testimony erroneously received in evidence over defendant's protests and were highly prejudicial and deprived the defendant of a fair trial." 45 So.2d at 300.
Writing to this issue the Supreme Court held:
 "`Evidence of the statements of a person since deceased with references to the purpose or destination of a trip or journey, no matter how short, that he was about to make, has been admitted as competent in a considerable number of actions, both civil and criminal in character. See the following cases: (citing Mutual [Life] Ins. Co. v. Hillmon, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706, and decisions from other federal courts together with cases from Alabama and many other states).'
 The rule was stated in Alabama by this court as early as 1844, speaking through Collier, C.J.: `It was said in West v. Price's Heirs, 2 J.J. Marsh [Ky.], 380, that "conversations or declarations made by the actor or party concerned, at the time an act is done, and which explain the quo animo and design of the performance, may, whenever the nature of the act is called in question, be given in evidence as part of the res gestae. Without tolerating this explanation of the acts of men, by receiving their accompanying declarations, we should be often misled as to their true nature and character, and consequently liable to fall into errors in respect to them. The rule requiring res gestae declarations to be received as evidence, is a necessary and very useful one." (Citing authorities).
 `In the case before us, the thing done was the departure of the plaintiff from his home; what he said upon leaving, or immediately previous thereto, as to the point of his destination, the object he had in view and when he expected to return, were explanatory of his intention; and in the absence of opposing proof, might repel the imputation that he was absconding or otherwise endeavoring to evade the service of ordinary process. These declarations, it is true, would not be conclusive upon the defendant; but it would be competent for him to prove that they *Page 144 
were not just exponents of the res gestae. Other evidence would be admissible to show that his acts and intentions were different from what his statements indicated. The testimony on this point, it will follow, was improperly rejected.' Pitts v. Burroughs, 6 Ala. 733.
 This rule of evidence has been repeatedly reaffirmed by our courts. Kilgore v. Stanley, 90 Ala. 523, 8 So. 130; Martin v. State, 77 Ala. 1; Harris v. State, 96 Ala. 24, 11 So. 255; Burton v. State, 115 Ala. 1, 22 So. 585; Central of Georgia R. Co. v. Bell, 187 Ala. 541, 65 So. 835; Robertson v. State, 218 Ala. 442, 118 So. 654; Rogers v. State, 16 Ala. App. 58, 75 So. 264; Hall v. State, 26 Ala. App. 344, 159 So. 500.
 The res gestae alluded to here is not the res gestae of the main fact — the murder, but the res gestae of the act being performed or immediately contemplated by the declarant, the act of beginning or contemplating the trip or journey. Maddox v. State, 159 Ala. 53, 48 So. 689; Mayo v. State, 15 Ala.[App.] 304, 73 So. 141; Hardaman v. State, 17 Ala. App. 49, 50, 81 So. 449.
 The ruling of the court in receiving the testimony of the witness Mrs. Taylor was consistent with the rule and free from error." 45 So.2d at 301.
While in Thornton, supra, the deceased referred to the appellant by name in his conversation with his wife and here the deceased referred only to the "good looking guy she was dancing with," we find the cases essentially indistinguishable. The deceased stated that the "good looking guy she was dancing with," who by all fair inferences was the appellant with whom she had danced only minutes earlier, offered to take her to Fosters, the very community where she lived. The deceased also stated that she and the "good looking guy she was dancing with" "would follow" the Phillips girls and might "pull off on the side of the road." These statements, in light of Thornton, supra, can be fairly said to be part of the "res gestae of the act being performed or immediately contemplated by the declarant, the act of beginning or contemplating the trip or journey," however short. 45 So.2d at 301. Thus, falling within the res gestae exception, the deceased's statements were properly admissible to be considered and weighed along with the other evidence by the jury.
 II
We now consider the sufficiency of the State's evidence. There was no eyewitness to the murder; all the evidence presented is circumstantial. In Cumbo v. State, 368 So.2d 871
(Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979), an opinion authored by Judge Bowen of this court, we find the following authority pertinent to the issue before us:
 "In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. United States v. Black, 497 F.2d 1039 (5th Cir. 1974); United States v. McGlamory, 441 F.2d 130
(5th Cir. 1971); Clark v. United States, 293 F.2d 445
(5th Cir. 1961).
 `(W)e must keep in mind that the test to be applied is not simply whether in the opinion of the trial judge or the appellate court the evidence fails to exclude every reasonable hypothesis but that of guilt; but rather whether the jury might so conclude. Harper v. United States, 405 F.2d 185
(5th Cir. 1969); Roberts v. United States, 416 F.2d 1216 (5th Cir. 1969). The procedure for appellate review of the sufficiency of the evidence has been aptly set out in Odom v. United States, 377 F.2d 853, 855 (5th Cir. 1967):
 "Our obligation, therefore, is to examine the record to determine whether there is any theory of the evidence from which the jury might have *Page 145 
excluded every hypothesis except guilty beyond a reasonable doubt. Rua v. United States, 5 Cir., 1963, 321 F.2d 140; Riggs v. United States, 5 Cir., 1960, 280 F.2d 949. In Judge Thornberry's words,
 `* * * the standard utilized by this Court is not whether in our opinion the evidence and all reasonable inferences therefrom failed to exclude every hypothesis other than guilt, but rather whether there was evidence from which the jury
might reasonably so conclude.' Williamson v. United States, 5th Cir. 1966, 365 F.2d 12, 14. (Emphasis supplied)
 `The sanctity of the jury function demands that this court never substitute its decision for that of the jury. Our obligation is to examine the welter of evidence to determine if there exists any reasonable theory from which the jury might have concluded that the defendant was guilty of the crime charged.' McGlamory, 441 F.2d at 135 and 136.
 See also Blair v. State, 18 Ala. App. 615, 93 So. 45
(1922). Whether circumstantial evidence tending to connect the defendant with the crime excludes, to a moral certainty, every other reasonable hypothesis than that of the defendant's guilt is a question for the jury and not the court. Cannon v. State, 17 Ala. App. 82, 81 So. 860 (1919); see also Evans v. State, 39 Ala. App. 404, 408, 103 So.2d 40, cert. denied, 267 Ala. 695, 103 So.2d 44 (1958).
 Circumstantial evidence may afford satisfactory proof of the corpus delicti in a murder prosecution, and, if facts are presented from which the jury may reasonably infer that the crime has been committed, the question must be submitted to the jury. Hopson v. State, 352 So.2d 500, 502 (Ala.Cr.App.), affirmed, 352 So.2d 506 (Ala. 1976). However, circumstantial evidence justifies a conviction only when it is inconsistent with any reasonable theory of innocence.
 `The humane provisions of the law are, that a prisoner, charged with a felony, should not be convicted on circumstantial evidence, unless it shows by a full measure of proof that the defendant is guilty. Such proof is always insufficient, unless it excludes, to a moral certainty, every other reasonable hypothesis, but that of the guilt of the accused. No matter how strong the circumstances, if they can be reconciled with the theory that some other person may have done the act, then the defendant is not shown to be guilty, by that full measure of proof which the law requires.' Ex parte Acree, 63 Ala. 234 (1879).
 Guilt is not established by circumstantial evidence unless the facts relied on are such that it is the only conclusion fairly to be drawn from them. Fuquay v. State, 22 Ala. App. 243, 114 So. 892 (1927). If all the material circumstances in evidence point to guilt and exclude any reasonable hypotheses except that of guilt, a conviction is warranted. Pruett v. State, 33 Ala. App. 491, 495, 35 So.2d 115 (1948).
 However `it is not every hypothesis, but every reasonable hypothesis but that of guilt, that the circumstantial evidence must exclude.' 23 C.J.S. Criminal Law § 907 (1961).
 `(T)he true test of the sufficiency of circumstantial evidence to justify a conviction is whether the circumstances as proved produce a moral conviction to the exclusion of every reasonable doubt. It is not necessary for the circumstances to be `such as are absolutely incompatible, upon any reasonable hypothesis, with the innocence of the accused'. Bland v. State, 75 Ala. 574; Banks v. State, 72 Ala. 522; Matthews v. State, 55 Ala. 65.' Mitchell v. State, 114 Ala. 1, 6, 22 So. 71, 72
(1897).
 See also Parmer v. State, 20 Ala. App. 233, 235, 101 So. 482 (1924)." 368 So.2d 874, 875.
In reviewing the facts of this case we think that there was sufficient evidence, though just barely, from which the jury might have excluded every reasonable hypothesis except that of guilty beyond a reasonable doubt. The appellant and the deceased were seen dancing together at 1:30 a.m. just fifteen minutes before the deceased *Page 146 
and the Phillips sisters were in the Phillipses' car ready to go home. To the Phillips sisters' knowledge the deceased had danced with only one other person at the Super Market that night, a high school classmate, whom all the girls well knew by name. Neither of the Phillips sisters knew the appellant by name, nor was there any evidence that the deceased did; however, the deceased danced with appellant more than once that night. At approximately 1:45 a.m., while the Phillips sisters and the deceased were seated in the Phillipses' car outside the Super Market, the deceased remarked, "Did you see the guy I was dancing with? He was good looking, wasn't he? I think I'll go in there and talk to him, he said he would take me to Fosters. I'll follow you all. You know what to do if he pulls off." To Sharon Phillips' knowledge the appellant was the last person the deceased had danced with at 1:30 a.m. Also, the deceased, in making the remark, did not refer to her high school classmate, whom she knew by name and who was the only other person she had been seen dancing with, but referred to "the guy
I was dancing with." It is certainly a reasonable inference, based on these facts, that "the guy" the deceased was talking about was the appellant.
Vickie Windham saw the appellant talking to a female inside the Super Market and saw him come outside with the same female around 2:00 a.m. at the time the Super Market was closing. The clothing description and hair length of the female Ms. Windham saw with appellant was not unlike that of the deceased — long dark pants, a long sleeved shirt and hair about to the collar. The deceased was wearing dress blue jeans, a long sleeved rust colored blouse, a black vest and had hair long enough to cover her ears. There was no dispute in the testimony as to when these events transpired.
As early as 9:30 or 10:00 o'clock on Monday morning, August 28, when the deceased had merely been reported "missing," the appellant called Eve Rominger and asked her for his alibi for Friday night. Appellant even asked Ms. Rominger to say she had "sneaked out" of the house after her mother had seen her come in from the Super Market sometime after 12:30 a.m. because "heknew that he was going to need an alibi." It must be remembered that the deceased's body was not discovered until approximately 6:00 p.m., several hours after appellant asked Ms. Rominger to be his alibi. On Tuesday or Wednesday following the discovery of the deceased's body Monday afternoon, appellant's mother found the much testified to earring in the back seat floorboard of the car appellant had driven on the night in question. Appellant's mother had never seen the earring before and it matched exactly the earrings the deceased's mother was sure the deceased wore to the Super Market the night she was last seen alive. The earring was Sarah Coventry jewelry, had only been on the market a short time, and the deceased had one of the few pairs that had been sold in the area. The strong inferences that the earring found in appellant's car belonged to the deceased are inescapable. Next in the chain of circumstances is appellant's alibi statement to Deputy Don Lake that he had left the Super Market "some time after midnight" with a white female wearing "all white clothes, jump suit, long dress" with "shoulder-length blond hair which was of the Farrah Faucett fluffed up style." This female had a "Gran Prix" (the Phillips sisters and the deceased were in a Gran Prix) and ironically had to "sneak in" her house somewhere in Forestasia. Appellant had asked Eve Rominger as his first attempted alibi to say she had "sneaked out" to be with him. Ms. Rominger had informed appellant in their Monday morning conversation that the only blond she remembered being around appellant at the Super Market was a girl named Linda, Belinda, or Melinda. Melinda Wade Harris was subsequently located and testified that she left the Super Market on the night in question with Rocky Townsend, not the appellant. Mrs. Harris had left the Super Market with appellant the previous weekend. On that occasion her hair had been "long blond," "sort of Farrah Faucett style." And she had *Page 147 
worn "white pants with a cream colored top." Her version of what transpired between herself and appellant after they left the Super Market the previous weekend was not dissimilar to appellant's alibi statement to Deputy Lake, except for the location of their indiscretions (a cemetery versus a clubhouse parking lot) and the place where they parted company (somewhere in Forestasia versus his car at the Super Market). By all fair inferences the "Melinda" in appellant's alibi statement was Melinda Wade Harris. The truth of his alibi, thus, became a question for the jury along with the other evidence. A false explanation given by the accused of any suspicious fact or circumstances tending to connect him with the offense is admissible in evidence against him. Franklin v. State, 145 Ala. 669,39 So. 979 (1906). The jury may properly consider conflicting statements as indicating a consciousness of guilt.Cumbo, supra. Reasonable inferences from the evidence may furnish basis for proof beyond reasonable doubt. Royals v.State, 36 Ala. App. 11, 56 So.2d 363, cert. denied, 256 Ala. 390, 56 So.2d 368 (1951). Guilt need not be proven to the "exclusion of every possibility of innocence" to warrant a conviction. Burks v. State, 117 Ala. 148, 23 So. 530 (1898). The State's evidence should not be stricken out, as insufficient to support a conviction, merely because, when disconnected it is weak and inconclusive, if, when combined, it may be sufficient to satisfy the jury of an accused's guilt.Howard v. State, 108 Ala. 571, 18 So. 813 (1895). Circumstantial evidence is entitled to the same weight as direct evidence provided it points to the guilt of the accused.Trammell v. State, 377 So.2d 12 (Ala.Cr.App. 1979). The credibility of witnesses is solely for their consideration and cannot be examined by this court. Cumbo, supra. The evidence was sufficient to sustain the verdict.
 III.
Appellant maintains the trial court erred in admitting State's exhibits 12 through 18. He contends that the exhibits were of no probative value and should have been excluded.
Several witnesses testified at length concerning these exhibits prior to their formal introduction into evidence. The witnesses were Mr. William H. Landrum of the Department of Forensic Sciences, Mrs. Peggy Hayes, Shirley Fields of the Tuscaloosa Police Department, Investigator Wayne Murphy of the Tuscaloosa County Sheriff's Department and Dr. John R. McDuffie, also of the Department of Forensic Sciences. Much of these witnesses' testimony pertaining to the exhibits came in without objection and was elicited on cross-examination by appellant. The summation of their testimony made it clear beyond all reasonable doubt that the exhibits were not connected with the deceased, and in addition, provided reasonable explanations as to what the exhibits were and how they came to be in appellant's car. The witnesses' testimony assuredly became "evidence" in the case, just as the formal introduction of the actual exhibits did. Furthermore, their testimony was of a conclusive nature and could not have confused the jury. In other words, there could have been no misunderstanding among the members of the jury as to what the exhibits were and how they got in appellant's car.
We hold, therefore, that the formal introduction of the exhibits, which was preceded by detailed testimony concerning the exhibits' true nature, represented no more than the sum of the preceding testimony and did not cause reversible error. The admission of cumulative evidence, even upon an undisputed fact, is not prejudicial error. Robinson v. State, 342 So.2d 1331
(Ala.Cr.App. 1977). In addition, even the erroneous admission of evidence is not ground for reversal, if the same evidence has already been admitted to the jury without objection.Crenshaw v. State, 205 Ala. 256, 87 So. 328 (1921). And the admission of evidence which is merely cumulative of an admitted fact is error without injury to the accused. Senn v. State,35 Ala. App. 62, 43 So.2d 540 (1950). See also ARAP, Rule 45. *Page 148 
 IV.
Appellant alleges the trial court erred in allowing Officer Don Lake to refer to certain notes during his direct examination by the State. Appellant contends the alleged error occurred at two separate places in the record.
First, Officer Lake testified that he had a conversation with "someone about a small article" after September 5, 1978, when the following exchange occurred;
 "Q All right. What time of day did you first have contact with someone about a small article being found?
 MR. PRINCE: Your Honor, if he's using a document to refresh his recollection, are not we entitled to look at it? If he's fixing to read from some document in his file to refresh his recollection —
THE COURT: Well, I don't know what it is.
 MR. PRINCE: May I take him on voir dire and ask him?
 THE COURT: No, sir, you may have him on cross-examination.
 MR. PRINCE: Well, do I understand the court's ruling that if he's going to read from something in his file, that we can't look at it until we get him on cross-examination?
 THE COURT: I haven't ruled any such thing, Mr. Prince, I said you could have him on cross-examination. I don't think you can break right in the middle of a direct examination for something like that.
 MR. PRINCE: Before he gets a chance to refresh his recollection, I can't see it?
 MR. WILLIAMS: It has not been shown that he needs to refresh his recollection in any manner, Your Honor.
THE COURT: All right, go ahead." (R.p. 791, 792)
There is no indication in the record following this exchange that Officer Lake referred to his notes during his testimony. From all that appears in the record, Officer Lake testified from memory that he had two conversations with defense counsel on September 8 concerning a "small article," and that following the second conversation appellant was arrested.
Secondly, after the Miranda and voluntariness predicates for appellant's statement were established in the presence of the jury, the next exchange occurred:
"Q And would you relate that statement to the jury?
 MR. PRINCE: Your Honor, before he does that I'd like to make another objection aside (sic) the grounds that I've already made. It's based on the ground of what Mr. Lake is doing, he's testifying either from memory or from some document in his file, it doesn't reflect the questions he asked Mr. Hayes, it's not signed by Mr. Hayes and we object to it.
THE COURT: All right. I'll overrule." (R.p. 821)
Appellant's statement was then read into the record by Officer Lake.
On cross-examination, Officer Lake testified that he read appellant's statement from a prepared memorandum in his file. When asked what method he used in taking appellant's statement Officer Lake stated, "I just wrote down what we talked about. . . . I wrote it out while sitting there at the jail, while Mr. Hayes and I were sitting at the jail, and I read it back to him at the jail, and then it went into the file and the secretary typed it up at a later date from the file. When it was put together, there were no notes written out" (R.p. 829-830).
On redirect the State offered both Officer Lake's handwritten version and the typewritten version of appellant's statement: "[W]e would offer, if there is any question of discrepancy between the two, we would offer them both for the jury to look at." Appellant's objection was overruled.
Based on the record we do not find error in either instance. In the first instance it was not shown that Officer Lake, in fact, read from a memorandum concerning his September 8 conversations with defense counsel. Defense counsel's objection *Page 149 
states, "If he's fixing to read from some document. . . ." There was no allegation that Officer Lake was actually reading from his notes. The district attorney made it clear that it had not been shown Officer Lake needed "to refresh his recollection in any manner." The record further demonstrates that the trial judge was not prohibiting defense counsel from examining any notes Officer Lake was reading from; it simply had not been shown Officer Lake was refreshing his memory by referring to his notes, nor was there any attempt on the State's part to introduce the notes. Thus, Officer Lake may have had certain notes in his file while on the stand alluding to his September 8 conversation with defense counsel; however, there is no proof he actually referred to them or used the notes as the basis of his testimony.
In the second instance, Officer Lake read verbatim appellant's statement into evidence from a prepared memorandum in his file. It is not error to read an accused's statement into evidence, Mullis v. State, 258 Ala. 309, 62 So.2d 451
(1952). Officer Lake's handwritten and typewritten versions of appellant's statement were introduced only after Officer Lake was questioned on cross-examination as to the method he employed in taking the statement. The written statements were not offered to refresh recollection, but as evidence appellant's statements were written down. We would point out that a confession is not rendered involuntary because it is not verbatim as related by the accused and is admissible if its transcription is substantially as related and affirmed by the accused. Dennison v. State, 259 Ala. 424, 66 So.2d 552 (1953);King v. State, 355 So.2d 1148 (Ala.Cr.App. 1978). A written confession does not have to be in question and answer form.Sherman v. State, 38 Ala. App. 106, 77 So.2d 495, cert. denied,262 Ala. 704, 77 So.2d 499 (1955). Nor is it necessary for the accused to sign the writing. Bennefield v. State, 281 Ala. 283,202 So.2d 55 (1967). In the instant case, appellant's statement is in no wise a confession to the crime charged, but rather served as an alibi in an attempt to negate his guilt. Appellant testified to essentially the same facts as contained in his alibi statement during his examination. We find no error either in the admission of Officer Lake's reading of appellant's alibi, or in the later reception of the actual handwritten statement taken by Officer Lake that was later transcribed.
 V
We have closely examined the State's closing argument and find appellant's contention that prejudicial error occurred to be without merit. Statements of counsel in argument to the jury must be viewed as in the heat of debate, and such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.Arant v. State, 232 Ala. 275, 167 So. 540 (1936); Beckley v.State, 335 So.2d 244 (Ala.Cr.App. 1976).
The prosecutor, as does defense counsel, has a right to present his impressions from the evidence. McQueen v. State,355 So.2d 407 (Ala.Cr.App. 1978); Carroll v. State, 36 Ala. App. 59, 52 So.2d 171 (1951). He may argue every matter of legitimate inference and may examine, collate, shift, and treat the evidence in his own way. McQueen, supra; White v. State,41 Ala. App. 54, 123 So.2d 179, cert. denied, 271 Ala. 702,123 So.2d 186 (1960).
In conclusion, we have carefully examined each issue raised in brief and presented at oral argument. In addition, we have searched the entire record for error as required by law. Finding no prejudicial error, the trial court's judgment of conviction is, therefore, due to be affirmed.
AFFIRMED.
All the Judges concur.
[1] Cary Crawford was referred to as Cary Cockrell in Sharon Phillips' testimony. *Page 150