103 So.2d 40

Edward P. EVANS

v.

STATE.

7 Div. 472.

Court of Appeals of Alabama.

March 11, 1958.

Rehearing Denied March 25, 1958.

CATES, Judge.

The sheriff of Talladega County arrested Evans on April 7, 1956, for possessing whiskey (Code 1940, T. 29, § 98), for which Evans was, on November 29, 1956, convicted by a jury in the Circuit Court, fined $300, to which the judge added six months at hard labor.

On the day of the arrest, the sheriff, Mr. John Robinson, after first getting a search warrant, went with several of his deputies to a house trailer located on a lot about three miles from Childersburg between the Coleman Bridge road and Bon Air: Robinson said Evans was living in the trailer. As the raiding party drove up, two men in a car backed out and left. The sheriff did not know them. Evans and Mrs. Margaret Nicholson were at the trailer: Robinson testified—"I think he was going in the trailer when I pulled into the yard." On being told of the warrant, both asked Robinson to come on in the trailer. No liquor was found there; nor in Evans' car, save for an empty half pint bottle which Robinson left in the car. The label bore the same brand as that of some found across the road.

The sheriff's testimony continued:

"Q. Then after you searched the automobile, where did you search, Sheriff? A. I was out there walking around in the yard there and one or

Love & Hines, Talladega, for appellant.

John Patterson, Atty. Gen., and Geo. D. Mentz, Asst. Atty. Gen., for the State.

two of the boys went out there in the woods and I saw a little ole trail there leading across the road.

"Q. What kind of tracks did you see Sheriff? A. They was made by a man's shoe.

"Q. Go ahead in your own words and tell us what you saw and found? A. I saw that little ole trail, a little ole wooden bridge with about three planks on it, I saw where it crossed the road there and I saw a trail leaving the road there going across the bank and John Henry Jones and myself went out there and as soon as we got across the road to the right about three or four steps, I saw a suitcase there open * * *

*   *   *   *   *   *

"A. We found 11 half pints and one pint in the suitcase and I saw a little trail going both ways, to the left there was a little trail on the side of the road about 7 or 8 feet off the road leading to a barrel, it looked like a little pasteboard barrel, about a 20 gallon barrel, it was sitting there. Altogether I think there was 26 half pints and I believe it was 14 pints of whiskey right together, there wasn't over 15 feet between them.

"Q. Now, how far was this from the house trailer, where these two stashes. A. It would be around 15 steps.

"Q. Is that from the road now, or the house trailer itself. A. From his yard. The house trailer was setting off about 20 feet off the road.

"Q. In other words, you say the house trailer was some 20 feet off the road and then the stash was about 15 steps from the edge of the yard, would that make it somewhere in the neighborhood of 80 feet? A. Something like 65 or 70 feet.

*   *   *   *   *   *

"Q. Did the trail lead from the edge of the yard there where the house trail-

er was parked directly to the whiskey? A. Yes, sir.

"Q. Was there any other houses down there, across, that is on the same side of the road that the whiskey was on? A. There was an empty house there.

"Q. How close was that to where the stash was at? A. The trailer was between that house and the road.

"Q. In other words, the trailer was the nearest house, living quarters there to the whiskey? A. Yes, sir."

After Mr. Robinson arrested Evans, he checked the bottles for fingerprints and "lifted" several, the impressions of which he transposed to glass slides which were sent to the State Toxicologist's office along with Evans' known fingerprints. W. L. Sowell, an Assistant State Toxicologist, testified that at least two of the prints tallied with known specimens: one was made by Evans' left index finger and another by the middle finger of the right hand. There was no evidence to show from which bottle or bottles the identified prints came, except only that they were part of specimens lifted from six pint bottles (containing whiskey) which were in court.

The sheriff found a number of whiskey bottle labels (of the same brands as those found in the suitcase and pasteboard barrel) lying about the yard around the trailer. He put these in a paper sack and identified them on the witness stand. It had been raining before the raid—"it was rainy weather"—but the suitcase found across the road from the trailer yard was dry. Evans was not seen on the "side of the road around the whiskey." No witness ever saw Evans with his hands on any of the whiskey.

With the exception of the space where it crossed the public road, a trail—which led from the trailer to the caches—was "wore down," "a pretty nice trail." Prints of men's shoes stood out in the mud on the trail.

On cross-examination of Mr. John Henry Jones, a deputy sheriff, the following was brought out:

"Q. Do you know Mr. T. S. Thomas? A. Yes, sir.

"Q. He lives right down there at that place, doesn't he? A. No, he lives at the dairy near where I live.

"Q. You caught him about a week after this right down there at that very same place about 60 or 75 feet down from there, didn't you? A. Yes, I caught him about 75 feet on down the road about a week later.

"Q. On the very same side of the road, wasn't it? A. No, I caught him on the side of the road the trailer was on.

"Q. He was picking it up when you caught him, wasn't he? A. Yes, sir.

"Q. You carried him right on to jail and he paid off? A. Yes, sir, he paid off.

"Q. How far was that at that time that you caught T. S. Thomas, from this trailer that you testified to? A. I would say about 75 yards, something like that.

\* \* \* \* \* \*

"Q. As you drove in that particular day T. S. Thomas backed his car out and left? A. No, sir.

"Q. Did you see a car back out and leave? A. I saw a car back out and leave.

"Q. Did you know those men? A. No, sir, I didn't.

"Q. Do you tell this jury that neither one of them was T. S. Thomas? A. No, I don't know. I didn't know them. I didn't notice close enough to know who they was.

\* \* \* \* \* \*

"Q. You are telling this court that Mr. Evans was there when you caught T. S. Thomas? A. Yes, sir, the day I caught T. S. Thomas the defendant come out in the road and talked to me.

"Q. And asked you to smooth things up and give and take and you said 'Right now I'm taking'? A. Yes, sir.

"Q. And you took? A. Yes, sir. Him and his whiskey."

Evans put Mrs. Nicholson on the stand to testify that she and her two children were the only persons living in the trailer and that Evans had no interest in or control over the premises. Evans himself took the stand giving the same explanation, adding that Robinson got his fingerprints from the empty half pint Robinson found in his automobile.

Evans argues but two assignments of error: First, as to the sufficiency of the evidence; second, as to Robinson's qualifications as an expert in fingerprint "lifting."

■ The evidence of Evans' fingerprints being on the bottles, if believed, is evidence of actual possession, though at an unspecified time and place. Hence, constructive possession cases, such as Grimes v. State, 38 Ala.App. 94, 76 So.2d 684, do not apply as to the possession by manucaption. Fingerprint testimony from an expert is competent; Leonard v. State, 18 Ala. App. 427, 93 So. 56, apparently assumes this proposition without requiring authority.

■ The "lifting" of fingerprints can be done by transposing the image of a print (made by powder insufflated or gently brushed on a suspected print) to a glass slide. Our view of the preparation of these glass slides (which were introduced in evidence) is that the work does not rise to that degree of art or skill requiring opinion evidence. Mr. Robinson told the jury step by step what he did to "lift" the prints, up to and including sending them registered mail to the State Toxicologist. Each step was understandable as a direct mechanical oper-

ation readily within the grasp of a school-boy's mind.

 To impute knowledge of the presence of liquor, we have consistently adhered to a high standard of proof in what are termed "constructive possession cases." This is because we are, in effect, saying, "The liquor was found in such a place that the defendant ought to have known of it being there," and thus we are making this conclusion serve as proof that he had the liquor in possession. Houston v. State, 38 Ala.App. 641, 93 So.2d 438.

 Here we have a set of circumstances of constructive possession which do not exclude the hypothesis of innocence standing alone. However, when coupled with evidence of actual possession—as the jury could have inferred from the sheriff's testimony as to where he found Evans' fingerprints—there was a prima facie case and this holds even if the time and place of actual possession do not appear.

 A prima facie case can exist side by side with the strongest of proof for a defendant. We, in reviewing for insufficiency of evidence, examine only to see that the gravamen of the offense is established by more than a mere scintilla; we review as a matter of law but can go no further in drawing deductions from the evidence, unless we consider there is some element showing deprivation of a fair trial. See Autry v. State, 34 Ala.App. 225, 38 So. 2d 348; Stoppelli v. United States, 9 Cir., 183 F.2d 391, where fingerprint evidence sustained an inference (21 U.S.C. 174, 21 U.S.C.A. § 174) of possession of heroin.

We have reviewed the entire record, as required by law, and find it free of any substantial error.

Affirmed.