The appellant was charged in a three count indictment with first degree burglary, robbery, and rape. The jury returned a verdict of guilty on all three counts and the trial court set sentence at life imprisonment. From this conviction the appellant makes his appeal.
The facts in this case are not complicated. A detailed narration describing the abominable *Page 887 
and revolting conduct is not necessary. The sixty-nine year old victim positively identified the appellant as her assailant. The evidence clearly supports the jury's finding that the appellant broke into the victim's house, raped her, and robbed her of $29.85.
 I
Initially the defendant argues that his conviction should be reversed because his signed confession was involuntary and therefore improperly admitted into evidence. This contention of involuntariness is based on two factors: (1) the defendant's mental capacity and (2) his testimony that he only confessed because he was threatened with a cattle prod.
The trial court held a pretrial hearing on the defendant's motion to exclude his confession. Three witnesses testified.
Sergeant W.A. O'Bryant, a detective with the Gadsden Police Department, testified that he questioned the defendant about the rape, robbery, and burglary. Detective O'Bryant handed the defendant a waiver of rights form. The defendant took the form and looked at it like he was reading it. O'Bryant then read theMiranda rights from the waiver form and asked the defendant if he understood his rights. The defendant stated that he understood those rights.
O'Bryant stated that he did not coerce or threaten or make any promises to the defendant to obtain the confession and did not threaten him with a cattle prod. O'Bryant acknowledged that the defendant "appeared" to have "some sort of low mentality".
O'Bryant read the defendant's statement back to him after he made it to insure that he understood what he was signing. The defendant then signed the confession. Detective O'Bryant was the only officer present when the defendant signed the waiver and made his confession. There is no evidence that the defendant had been questioned at any other time or by any other officer.
O'Bryant talked to the defendant only a very short time, some thirty to thirty-five minutes, before he admitted the rape and robbery.
Defense counsel introduced a copy of the medical records of the defendant from Bryce State Mental Hospital, where the defendant had been sent by the court pursuant to a motion for mental competency examination filed by his attorneys. Contained therein is a report of psychological evaluation relevant to the mental condition of the defendant. We set forth portions of that summary.
 "RELEVANT BACKGROUND INFORMATION AND BEHAVIORAL OBSERVATIONS: Mr. Joshua is a single, black, 19 year old, illiterate male with an educational history of eleven years in special education. Mr. Joshua stated that he had been employed in construction work but had to quit because he suffers from dizziness and blackout spells. He denies using alcohol or drugs and states that he has no juvenile record. At this time Mr. Joshua faces the following charges: (a) First Degree Burglary, Robbery and Rape; . . Mr. Joshua states that he was intimidated, threatened, and physically abused to the point of having a cattle prod used on him, in police efforts to coerce him into confessing to the above series of crimes. He also states that his court appointed lawyer shows no interest in listening to his side of the story.
 "Mr. Joshua was a pleasant, cooperative young man who had no difficulties in understanding and following directions. He communicates well and his comments are clear and relevant.
 "INTELLECTUAL FUNCTIONING: On the WAIS Mr. Joshua earned a Verbal IQ of 59, a Performance IQ of 65, and a Full Scale IQ of 60. All findings are within the mildly mentally retarded range. His educational history suggests that this is a valid estimate of both his current and long term level of functioning."
* * * * * * *Page 888 
 "PERSONALITY STRUCTURE AND FUNCTIONING: As a retarded person, Jr. Joshua is limited in his understanding of complex social interactions, his ability to acquire vocational skills, and facility in assuming an independent adult male role in society. However, his Sentence Completions and conversation suggests that he is a relatively self accepting young man and more streetwise than his obtained IQ would lead one to expect. No symptoms of a thought disorder were elicited during testing.
 "DIAGNOSTIC IMPRESSIONS: Mr. Joshua is a mildly mentally retarded individual who appears to be organically impaired.
 "SUMMARY AND RECOMMENDATIONS: Mr. Joshua is a single, black, 19 year old, mildly mentally retarded male whose testing suggests organic impairment. No evidence of a thought disorder was found during testing. Within his intellectual limitations Mr. Joshua is competent to proceed to the judicial process."
The defendant testified that he had gone to the eleventh grade, had been enrolled in a special education program and had made "F's" all the way through school. He stated that he could not read and could only write his name. He denied knowing what the words "waiver", "statement", and "constitutional rights" mean. Although he stated that Sergeant O'Bryant allowed Mrs. O'Bryant to bring him a hamburger and a coke during the questioning, the defendant testified that O'Bryant told him that if he "didn't testify that I did this he was going to do something to me. He made me pull down my pants." O'Bryant allegedly threatened the defendant with a cattle prod.
The defendant further testified that he could not read his confession; that O'Bryant did not let him call his father and that he was "tricked" into signing some papers he "didn't know nothing about".
On cross examination the defendant stated that he did not know and could not read the alphabet although he testified that there "ain't no I in my name . . . Any fool can tell you that". The only high grades he got in school were in "P.E." and "for writing (his) name" and "good handwriting". He admitted signing the statement but only "by threat". The defendant stated that he made "straight F's" in school and was passed on to the next grade because of "old age". He admitted that his rights and his statement "could have been" or "probably" were read to him by Sergeant O'Bryant but that he "didn't know the meaning".
Julian Joshua, the defendant's sister, also testified as to the defendant's mental incapacities. She stated that he was unable to correctly complete a job application and that she had to help him; that he never read books or the newspaper but just looked at the pictures and that he "could not read very well at all", probably on a first grade level. The defendant let his sister keep his money for him and she would "issue" it out to him when he needed it.
The defendant was recalled and read his rights. To each right he testified that he did not understand it or know what it meant. He admitted that his confession was read to him by Sergeant O'Bryant but maintained that he was forced to sign it. He denied understanding almost every sentence in the short confession.
After hearing the testimony the trial court denied the defendant's motion to suppress the confession.
At trial Detective O'Bryant essentially reiterated the testimony at the pretrial hearing on the motion to suppress. The defendant had been placed in a line-up before his statement was taken. O'Bryant stated that the defendant appeared "just like anyone else, just normal" when he took the statement. After O'Bryant finished typing the defendant's statement he "read it to him first and asked him again if this was the statement that he made". The defendant signed his name "just normal, just like anyone else would". The defendant signed the waiver of rights and the confession the first time after O'Bryant read it to him and asked him if he understood it. O'Bryant testified that the defendant *Page 889 
was only "with (him) five to ten minutes on the waiver. Probably with (him) thirty minutes or more, short time, thirty, thirty-five minutes on the statement." O'Bryant talked to the defendant in a normal tone of voice.
At trial, Julian Joshua testified that the defendant had difficulty reading and that he was home at the time the victim was raped.
The defendant's mother, Dorothy Joshua, also testified that the defendant was home. Regarding his mental condition, she testified that "he wasn't too good at school too much" and that he never graduated from high school. She stated that she talked to one of his teachers and "he told him he could learn if he was to get his mind on, you know, sit down. He always liked to play ball and things. Didn't think about his books. * * * He said he could learn more in his books if he would put his head on it." Mrs. Joshua stated that her son got "B's in, you know, talking. You know, language and things." She responded that the defendant could understand language "pretty good" but did not know what he could or could not understand.
The defendant testified in his own behalf. He denied that he committed any crime and maintained that he was home when the rape occurred. His testimony was essentially the same regarding the circumstances surrounding the taking of his confession as that given at the pretrial hearing. He further stated that he "was dumb, man, in school" and "didn't know a thing". He stated that his mother did not know what grades he made because he tore up his report cards and threw them away.
On rebuttal the State introduced a witness who testified that the defendant had a bad general reputation in the community and that she would not believe him under oath.
In attacking the admissibility of the confession the defendant erroneously argues that it should not have been admitted because the State presented no evidence that the defendant understood his rights.
Sergeant O'Bryant stated that the defendant appeared to have "some sort of low mentality" but stated he understood his rights after they had been read to him and he had been given a copy to read. There was no extended period of interrogation. Sergeant O'Bryant was the only person to question the defendant and, under his testimony, no intimidation or duress was employed in obtaining the waiver and confession. A psychological evaluation reported the defendant as "more streetwise than his obtained IQ would lead one to expect".
The trial court decided, at a pretrial hearing, that the appellant did make a knowing and intelligent waiver of his constitutional rights, and we think the State met the burden imposed upon it to so prove. The trial judge had the opportunity to hear and observe the appellant testify as to his competence and to his version of the circumstances surrounding his written waiver and confession. We find no error in his ruling. Elrod v. State, 281 Ala. 331, 202 So.2d 539 (1967).
The law is clear.
 "mental subnormality on the part of one confessing to a crime does not of itself deprive the confession of voluntariness or bar its admission in evidence, so long as the subnormality has not deprived the person in question of the capacity to understand the meaning and effect of the confession. But mental subnormality is a factor to be considered in determining the issues of voluntariness and admissibility, and, where accompanied by other factors indicative of an absence of voluntariness, will require that the confession be excluded." 69 A.L.R.2d 348, 350 (1960).
See also Twymon v. State, 358 So.2d 1072, 1074 (Ala.Cr.App. 1978); Arnold v. State, 348 So.2d 1092, 1096 (Ala.Cr.App.), cert. denied, 348 So.2d 1097 (Ala. 1977). In Ex Parte JimmieLee Garrett v. State, Ala., 369 So.2d 833 (Ms. March 9, 1979), the Alabama Supreme Court affirmed this position and held that, although the degree of intelligence of a prisoner should be considered in determining whether his confession is voluntary, "in most cases, the defendant's *Page 890 
mental deficiency will be but one factor to be considered in the totality of the circumstances surrounding the confession".
In Cooper v. Griffin, 455 F.2d 1142 (5th Cir. 1972), cited by the appellant, the evidence was undisputed that the defendants were incapable of an intelligent and knowing waiver. There the only contradicting evidence presented by the State was the testimony of the arresting and interrogating officers that the full Miranda warnings had been given and that each defendant appeared to understand the warning and orally waived the right to counsel and signed written waiver forms. As previously noted, in this case there was some conflicting evidence on the appellant's mental capacity.
Where there is a conflict in the evidence on the voluntariness of a confession, great weight must be given to the judgment of the trial judge in deciding this issue. His finding will not be disturbed on appeal unless palpably contrary to the weight of the evidence. Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty. Rhine v. State, 360 So.2d 1056, 1058
(Ala.Cr.App.), cert. denied, 360 So.2d 1060 (Ala. 1978).
The mental condition of an accused is rarely provable by direct or positive evidence. Most often it must be inferred from his physical actions and from the totality of the circumstances surrounding the questioned act to which the intent or mental state is relevant. Throughout the proceedings the defendant's testimony was coherent, responsive, and detailed. When asked by the trial court if he had anything to say before sentence was imposed he declared, "I'm going to appeal my case". Under these conditions the admission of the confession was not error.
 II
The defendant next contends that his line-up was conducted in an impermissibly suggestive manner and thus tainted the victim's in-court identification. The facts and law do not support this contention.
On March 3, 1978, four days after her attack, the victim testified that she was called by the Gadsden Police and asked to come down to the station to make an identification. The victim stated that Sergeant O'Bryant told her, "I think I've got your boys". The defendant was placed in a lineup with four other black males of approximately the same age, height and weight. The victim was not told which one of the five was the suspect. She had no difficulty in selecting the defendant. She immediately told the police, "It's number 4", and marked an "x" in the form to correspond to the defendant's position in the line-up. Sergeant T.F. Cox of the Gadsden Police Department conducted the line-up. He testified that the victim did not waiver in deciding who her assailant was. She also identified the defendant by voice. The victim had given a detailed description of her attacker to the police prior to the line-up which accurately matched in all respects the appellant's appearance.
Whether a line-up is unnecessarily suggestive and conducive to mistaken identification is to be determined from the totality of the surrounding circumstances. Foster v.California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969);McKay v. State, 51 Ala. App. 307, 310, 285 So.2d 117, cert. denied, 291 Ala. 788, 285 So.2d 122 (1973). The factors considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. Manson v. Brathwaite, 432 U.S. 98,97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); McGuff v. State, 566 F.2d 939, 941
(5th Cir. 1978). Furthermore, it is perfectly natural for persons called to view a line-up *Page 891 
to understand that a suspect is in the lineup. That they are told that he is, by someone connected with line-up, although generally inadvisable, does not contaminate the proceeding.Fletcher v. State, 337 So.2d 58, 59 (Ala.Cr.App. 1976).
 "A lineup is not a test run, a fire drill or an academic proceeding. The victim of a crime has the right to assume when asked to come to a lineup that he is not being toyed with, that there is more than an infinitesimal chance of a member of the lineup being the criminal. . . ." 337 So.2d at 60.
Applying the foregoing principles to the facts presented in this case we must conclude that the defendant's line-up was not conducted in a suggestive manner or that the victim's identification was mistaken. Thus, we hold it was not error to allow the victim's identification of the defendant into evidence.
 III
The trial court refused to give the following charges requested by the defendant:
 "Unless you are convinced beyond a reasonable doubt that the victim's in-court identification is not based in any part on the previous suggestion of guilt by a Gadsden Police Officer, you must disregard the victim's identification of Defendant as the guilty party."
 "The Defendant's position is that his statement was the result of threats made against him at the Gadsden Police Department."
It was not error to refuse these charges. The first charge is abstract as there is no evidence in the record which indicates that a Gadsden Police Officer suggested to the victim that the appellant was guilty. It is argumentative in that it announced no distinct proposition of law. And finally it is misleading in that it disregards other independent evidence upon which the victim's identification of the defendant may be based.Blackshear v. State, 88 Ala. 35, 7 So. 257 (1890). The second charge does not contain any principle of law, Turner v. State,160 Ala. 55, 49 So. 304 (1909), and is argumentative in nature.Smith v. State, 338 So.2d 1030 (Ala.Cr.App.), cert. denied,338 So.2d 1033 (1976).
 IV
The State made out a prima facie case under all three counts contained in the indictment. The testimony of the victim alone was sufficient to accomplish this. Arnold, supra; Godbee v.State, 56 Ala. App. 174, 320 So.2d 107 (1975). The State's evidence was sufficient for submission to the jury, and, if believed, would support a conviction for robbery, rape, and burglary. There was no error in the trial court's refusal to grant the defendant's motion to exclude the State's evidence.Arnold, supra; Edson v. State, 53 Ala. App. 460, 301 So.2d 226
(1974); Evans v. State, 39 Ala. App. 404, 103 So.2d 40, cert. denied, 267 Ala. 695, 103 So.2d 44 (1958).
We have searched the record for error as required by law and found none. Therefore the judgment of the trial court is affirmed.
AFFIRMED.
All Judges concur.