HARRIS, Presiding Judge.
The appellant was indicted and convicted for the first degree murder of Marilyn Copeland by stabbing her with a screwdriver or by striking blows to her head in violation of Ala.Code § 13-1-70 (1975). His punishment was fixed at life imprisonment in the state penitentiary. At arraignment, in the presence of counsel, appellant pleaded not guilty. He is represented on this appeal, as he was at trial, by court-appointed counsel, and has been furnished with a free transcript.
Appellant raises two issues on this appeal: the sufficiency of the state’s evidence and the admission of photographs of the deceased.
Mrs. Ada Lewis testified that she knew the deceased as a friend and neighbor and spent most of the day with her on June 19, 1979. Mrs. Lewis took the deceased to the intersection of Highway 31 and Interstate 459 in Hoover in Jefferson County around 3:15 p. m. that day, where the deceased planned to hitchhike to Tuscaloosa. The deceased was wearing blue jeans, a multicolored pullover top and sandal-type shoes that had a black velvet strap which held the sandals to the feet. Mrs. Lewis identified state’s exhibit 2 as a photograph of one of the deceased’s flip-flop type sandals. Mrs. Lewis saw the deceased at the Jefferson County morgue the next afternoon. The deceased was twenty-one years of age.
Dr. Ronald L. Rivers, the Jefferson County Medical Examiner/Coroner, performed an autopsy on June 29, 1979, and ascertained that the deceased had received eleven stab wounds to the head and chest and also had a laceration of the brain. The stab wounds were consistent with those which could have been made with a screwdriver. The laceration of the brain was consistent with that which could have been made with a tire iron. Dr. Rivers testified that either the stab wounds or the laceration of the brain matter would have been sufficient to cause the deceased’s death. Dr. Rivers also identified state’s exhibits 5 and 7 as photographs taken of the deceased prior to the autopsy at Cooper Green Hospital.
Mr. Jack R. Parker, Deputy Coroner for Jefferson County, testified that he went to the scene where the deceased’s body was found at the Birmingham Board of Education parking lot around 8:25 a. m. on June 20. He stated that the deceased was discovered lying on her side on the third floor of the parking deck. Mr. Parker identified state’s exhibits 8 and 9 as photographs he took of the deceased at the scene from two angles.
Mr. Michael L. Cochran, an internal officer for the Birmingham Board of Education, testified that he discovered the deceased’s body at the parking deck around 7:40 a. m. on his way to work. Mr. Cochran identified state’s exhibits 8 and 9 as photographs of the deceased. He specifically saw the deceased from the angle depicted in state’s exhibit 8.
Officer Carlos Faught of the Birmingham Police Department also saw the deceased at the parking deck. The body had grass, leaves and blood on it and was nude from the waist down. Officer Faught also identified state’s exhibits 8 and 9 as photographs of the deceased at the parking deck.
Officer L. E. Stricklin, an evidence technician with the Birmingham Police Department on June 20, 1979, testified that he went to the parking deck around 9:50 a. m. Officer Stricklin testified that he and Officer C. R. Wyatt participated in the investigation at the scene. Officer Stricklin’s testimony concerned items of evidence which were recovered and preserved at the scene. *1177 He testified in detail as to certain items of clothing that were found in a park approximately 75 to 100 feet from the parking deck. Officer Stricklin stated that the evidence which was recovered at and near the scene was turned over to the state crime lab.
Mr. Henry Crenshaw testified that his residence is located near the Lincoln Memorial Cemetery in the McCalla area of Jefferson County. Between 4:30 and 5:00 p. m., on June 19,1979, while walking through the cemetery, Mr. Crenshaw saw a brown Nova automobile parked behind some bushes on the back road leading into the cemetery. As Mr. Crenshaw continued walking he saw “a big tall man” who weighed “about 200 pounds” walk around the automobile. About a minute later the automobile backed up and began “running real fast on that rough road” out of the cemetery. Mr. Crenshaw explained that the road “was an old abandoned road; had ruts in it some places almost knee deep.” Mr. Crenshaw walked to his cousin’s house, told him what he had seen and the two returned to the cemetery to where the car had been parked.
Mr. Crenshaw and his counsin saw “two big puddles of blood on the ground,” a shoe and “a big long screwdriver ... covered with blood.” Mr. Crenshaw described the shoe as being black, the kind “you can slip your feet in” or a “shower shoe.” He identified state’s exhibit 2 as a photograph of the shoe he saw. Mr. Crenshaw stated that the screwdriver had a red striped handle.
Mr. Crenshaw testified that he later saw a brown Nova like the one he had seen in the cemetery at Ethel Sanders’ house in July. He identified state’s exhibit 11 as a photograph of the car. Mrs. Sanders was appellant’s aunt. Her residence was approximately one mile from the cemetery. Mr. Crenshaw stated that he had seen appellant in the cemetery on Easter Sunday; appellant’s father was buried there. Mr. Crenshaw stated that appellant “was a big, tall man then, and looked like he weighed around 200 pounds.” At the time appellant was arrested he was six feet four inches tall and weighed 215 pounds. Mr. Crenshaw identified appellant at trial but stated that he was “a lot smaller.” According to Mr. Sammy Joe Bryant, Jr., of the Birmingham City Jail, appellant had lost around 100 pounds between the time he was arrested and the time of his trial.
Deputy Bill Carter of the Jefferson County Sheriff’s Department testified that he was directed to the cemetery in question by Mr. Crenshaw on June 20. Deputy Carter saw the puddles of blood, the shoe and the screwdriver which had been there the day before and turned these items over to Officer C. R. Wyatt when he arrived approximately one hour later.
Officer C. R. Wyatt, an evidence technician with the Birmingham Police Department, testified concerning his collection of evidence at the parking deck and at the cemetery. He identified state’s exhibit 2 as a photograph of the sandal that was found in the cemetery. Officer Wyatt also received a blood sample from appellant at the Birmingham City Jail on July 19, 1979.
Mrs. Ethel Sanders testified that appellant, her nephew, lived in the McCalla area with his grandmother in 1979 before he left on July 5 for Detroit, where he had lived previously with his mother and sisters. Mrs. Sanders testified that appellant had worked at Bullock & Ron’s Cafe while he lived in McCalla. She also remembered that he had worked at the Omelet Shoppe at one time.
Mrs. Sanders stated that, when appellant left for Detroit, he left his brown Nova automobile with her. “He wanted me to pay a note on it until he got back.” She identified state’s exhibit 11 as a photograph of appellant’s car. Mrs. Sanders testified that she cut herself and bled a “little bit” inside appellant’s car trunk on one occasion. She had previously testified at appellant’s preliminary hearing that she had not cut herself while going inside the trunk. Mrs. Sanders thought that her blood type was A positive.
Officer John Guerrero of the El Paso, Texas, Police Department, testified that, on July 16, 1979, he met in El Paso with Sergeant Charles Melton of the Birmingham *1178 Police Department and proceeded with Sergeant Melton to the Greyhound Bus Depot where they apprehended appellant. Officer Guerrero stated that appellant was sleeping at the time he was arrested and had a carrying case with the name “Tony Washington” next to his leg. Officer Guerrero testified that appellant denied that he was Tony or Anthony Washington three times when he was arrested. Appellant was given his Miranda warnings, was searched and handcuffed. One of the items found in appellant’s carrying case that was later inventoried at the Police Department was a flat-head screwdriver eight to ten inches long. Officer Guerrero identified appellant in court but stated that appellant had lost weight.
Sergeant Charles Melton saw the deceased at the parking deck and at the morgue. He also saw the screwdriver and the shoe Officer Wyatt brought to the morgue that same day. Sergeant Melton described the shoe as a “K-Mart shower shoe.” He stated that he placed the shoe on the deceased’s foot and that the outline of a footprint inside the shoe coincided with the deceased’s foot. Sergeant Melton identified state’s exhibit 2 as a photograph of the shoe.
Sergeant Melton later obtained an arrest warrant for appellant and joined with Officer Guerrero in El Paso in making the arrest. He returned to Birmingham with appellant on July 19 and obtained a saliva sample from him.
Mr. Kevin Noppinger, a forensic serologist with the Department of Forensic Sciences, stated that he received certain items of evidence regarding the investigation of the deceased’s death. Mr. Noppinger ascertained from his analysis of the various articles of evidence he received that the deceased had Type A blood with enzyme AK, Type 1-1 and that appellant had Type 0 blood. The blood on the screwdriver was Type A as was the blood on the leaves and grass he received. The blood on the leaves and grass also tested positive for enzyme AK, Type 1-1. No bloodstains were found on the shower shoe.
In July of 1979 Mr. Noppinger examined appellant’s brown Nova in McCalla. He removed some hairs and a tire iron from the trunk. There was blood present on the lug portion of the tire iron. Mr. Noppinger also took a Type A blood sample from the spare tire, which was inside appellant’s trunk.
Mr. Noppinger further testified that he received from the Coroner’s office vaginal, anal, and oral swabs taken from the body of the deceased. Seminal fluid and spermatozoa were present on the anal and vaginal swabs. Mr. Noppinger was able to detect an H antigen from the vaginal swab which was consistent with someone with Type 0 blood. He explained that 80 percent of the population secrete their blood types into their body fluids: their saliva, semen, vaginal fluid and sweat. Mr. Noppinger determined that appellant, who had Type O blood, was such a secretor from his saliva sample. Appellant secreted Type 0 into his semen. From his examination Mr. Nop-pinger was able to determine that the deceased had had sexual intercourse with a person who secretes Type 0 blood.
Dr. John R. McDuffie, a criminalist with the Department of Forensic Sciences, testified that he compared the known hair samples taken from the deceased with brownish Caucasian hairs found in appellant’s trunk. His comparison revealed that the hairs found in appellant’s trunk had similar microscopic characteristics. “I examined the scale pattern as well as the scale diameter— scale thickness — the color, the diameter of the hair, the pigment granule, size, shape, and so forth, as well as the structure of the medulla of the hair.”
Miss Linda Faye Coleman testified that she knew the appellant prior to June 19, 1979, from his having worked with her at the Omelet Shoppe in Bessemer. Appellant had taken her home from work on more than one occasion and had become angry with her when she refused to “go out with him.”
Around 7:00 p. m. on June 19, 1979, Miss Coleman stated that appellant came to the Omelet Shoppe and she asked him if she could borrow a screwdriver “to tighten the *1179 screws on the ice bin.” Appellant replied that he had one she could borrow and “went out to his car to get it.” When Miss Coleman attempted to follow appellant to the trunk of his car, “he looked up, and he saw me. And he met me, and pushed me ... back to the door where, you know, I guess, it was'something he didn’t want me to see. And he closed the trunk.” Miss Coleman described the screwdriver as being long with a red handle.
Miss Coleman stated that, when she returned from a trip to New Orleans, she received a telephone call from appellant on June 23, 1979. “It sounded like he was upset, like he was crying.” Appellant told “he needed some money because he needed to leave town because he had killed somebody .... [H]e said it was a woman, and I stabbed her.”
Miss Coleman further testified that the week before appellant’s trial appellant called her at work and at home. “[H]e just explained to me about not showing up, not coming [to court to testify].... He told me that ... if I did, I wouldn’t be able to because my ear ... would be messed up and I wouldn’t be able to show up.”
Following Miss Coleman’s testimony the state rested its case and the defense moved to exclude. The defense motion was denied and the defense rested its case without presenting any evidence.
Viewing the evidence presented by the prosecution in its most favorable light, as we are required, Livingston v. State, 44 Ala.App. 559, 216 So.2d 731, we find the evidence sufficient to prove appellant’s guilt beyond any reasonable doubt. The state’s evidence clearly supports the jury’s verdict. Even though the state presented no eyewitness to the murder and much of the evidence presented was circumstantial in nature, circumstantial evidence standing alone is sufficient to support a conviction for murder. Dolvin v. State, 391 So.2d 133 (Ala.1980); Hayes v. State, 395 So.2d 127 (Ala.Cr.App.), cert. denied, 395 So.2d 150 (Ala.1981); Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979).
As our Supreme Court stated in Dolvin, supra, quoting from Cumbo, supra:
“In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. United States v. Black, 497 F.2d 1039 (5th Cir. 1974); United States v. McGlamory, 441 F.2d 130 (5th Cir. 1971); Clark v. United States, 293 F.2d 445 (5th Cir. 1961).
“ ‘(W)e must keep in mind that the test to be applied is not simply whether in the opinion of the trial judge or the appellate court the evidence fails to exclude every reasonable hypothesis but that of guilt; but rather whether the jury might so conclude. Harper v. United States, 405 F.2d 185 (5th Cir. 1969); Roberts v. United States, 416 F.2d 1216 (5th Cir. 1969). The procedure for appellate review of the sufficiency of the evidence has been aptly set out in Odom v. United States, 377 F.2d 853, 855 (5th Cir. 1967):
“ ‘Our obligation, therefore, is to examine the record to determine whether there is any theory of the evidence from which the jury might have excluded every hypothesis except guilty beyond a reasonable doubt. Rua v. United States, 5 Cir., 1963, 321 F.2d 140; Riggs v. United States, 5 Cir., 1960, 280 F.2d 949. In Judge Thornberry’s words, * * * the standard utilized by this Court is not whether in our opinion the evidence and all reasonable inferences therefrom failed to exclude every hypothesis other than guilt, but rather whether there was evidence from which the jury might reasonably so conclude. Williamson v. United States, 5th Cir., 1966, 365 F.2d 12, 14.’ (Emphasis supplied.)
“ ‘The sanctity of the jury function demands that this court never substitute its decision for that of the jury. Our obliga *1180 tion is to examine the welter of evidence to determine if there exists any reasonable theory from which the jury might have concluded that the defendant was guilty of the crime charged. McGlamory, 441 F.2d at 135 and 136.’
“See also Blair v. State, 18 Ala.App. 615, 93 So. 45 (1922). Whether circumstantial evidence tending to connect the defendant with the crime excludes, to a moral certainty, every other reasonable hypothesis than that of the defendant’s guilt is a question for the jury and not the court. Cannon v. State, 17 Ala.App. 82, 81 So. 860 (1919); see also Evans v. State, 39 Ala.App. 404, 408, 103 So.2d 40, cert. denied, 267 Ala. 695, 103 So.2d 44 (1958).”
And as we stated in Hayes, supra:
“The jury may properly consider conflicting statements as indicating a consciousness of guilt. Cumbo, supra. Reasonable inferences from the evidence may furnish basis for proof beyond reasonable doubt. Royals v. State, 36 Ala.App. 11, 56 So.2d 363, cert. denied, 256 Ala. 390, 56 So.2d 368 (1951). Guilt need not be proven to the ‘exclusion of every possibility of innocence’ to warrant a conviction. Burks v. State, 117 Ala. 148, 23 So. 530 (1898). The State’s evidence should not be stricken out, as insufficient to support a conviction, merely because, when disconnected it is weak and inconclusive, if, when combined, it may be sufficient to satisfy the jury of an accused’s guilt. Howard v. State, 108 Ala. 571, 18 So. 813 (1895). Circumstantial evidence is entitled to the same weight as direct evidence provided it points to the guilt of the accused. Trammell v. State, 377 So.2d 12 (Ala.Cr.App.1979). The credibility of witnesses is solely for their consideration and cannot be examined by this court. Cumbo, supra.”
Furthermore, there is evidence in this case that appellant engaged in flight to avoid prosecution after admitting to Miss Coleman that he had stabbed a woman to death. We find the following rules pertaining to evidence of flight correctly set out in C. Gamble, McElroy’s Alabama Evidence, § 190.01 (3rd Ed. 1977) and authority cited therein:
“In a criminal prosecution the state may prove that the accused engaged in flight to avoid prosecution. This principle is based upon the theory that such is admissible as tending to show the accused’s consciousness of guilt. The flight of the accused is admissible whether it occurred before or after this arrest.
“The state is generally given wide latitude or freedom in proving things that occurred during the accused’s flight. This is especially true of those acts of the accused which tend to show that the flight was impelled by his consciousness of guilt.”
Application of the foregoing principles of law to the facts in this case leaves no doubt that the state’s evidence was sufficient to sustain the verdict. Any conflicts in the evidence were properly resolved by the jury.
The trial court committed no error in admitting photographs of the deceased at the morgue before the autopsy and at the parking deck where her body was discovered. As a general rule photographs are admissible in evidence if they prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973); Thigpen v. State, 50 Ala.App. 176, 277 So.2d 922 (1973). Photographs may be admitted if they tend to shed light on, strengthen, or to illustrate other testimony in the case. Carpenter v. State, 400 So.2d 417 (Ala.Cr.App.), cert. denied, 400 So.2d 427 (Ala.1981). Photographs which show wounds on a victim’s body which tend to corroborate the testimony of a toxicologist as to the number and location of the wounds are admissible. Palmore v. State, 283 Ala. 501, 218 So.2d 830 (1969).
Photographs of the deceased in a murder prosecution are not required to be *1181 taken only at the scene and may be taken at the morgue as well. Brown v. State, 288 Ala. 684, 264 So.2d 553 (1972). Furthermore, photographs which depict the character and location of external wounds on the body of a deceased victim are admissible even though they are cumulative evidence based upon an undisputed matter. Ellenburg v. State, 353 So.2d 810 (Ala.Cr.App.1977). The fact that a photograph is gruesome and ghastly is no reason for excluding it, if relevant, even if the photograph may tend to inflame the jury. Carpenter, supra; Richards v. State, 337 So.2d 171 (Ala.Cr.App.), cert. denied, 337 So.2d 173 (Ala.Cr.App.1976). For these reasons the photographs objected to were properly admitted.
We have carefully reviewed the issues presented by appellant and have found no errors injuriously affecting his substantial rights. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.