LEIGH M. CLARK, Retired Circuit Judge.
Appellant was convicted on a jury trial under an indictment that charged in pertinent part:
“... Rickie Melvin Williams ... did solicit, request, command or importune Kevin M. Wilson to engage in conduct constituting the crime of murder (Title 13A-6-2 of the Code of Alabama) with *1343 intent that such person engage in such conduct in violation of Title 13A-4-1 of the Code of Alabama, ...”
New to the law of Alabama as of January 1, 1980, is Title 13A-4-1, which provides in § 13A-4-l(a):
“A person is guilty of criminal solicitation if, with the intent that another person engage in conduct constituting a crime, he solicits, requests, commands or importunes such other person to engage in such conduct.
“A person may not be convicted of criminal solicitation upon the uncorroborated testimony of the person allegedly solicited, and there must be proof of circumstances corroborating solicitation and the defendant’s intent.”
The undisputed evidence discloses the startling fact that Henry Reaid, appellant’s stepfather since appellant’s childhood, was murdered on or about July 1, 1982, by defendant’s mother, Madge Reaid, and defendant’s brother, Greg Williams, who were thereafter indicted and convicted of murder, prior to the trial of the instant case.
Three issues are presented on appeal. In one, appellant contends that the trial court was in error in admitting in evidence a statement taken from defendant “in violation of his Miranda rights.” In another, he says the court erred in not granting defendant’s motion for a change of venue. We have no difficulty in deciding each of such issues against appellant and see no need for a further discussion thereof other than as we will have occasion to consider the statement taken from defendant, in our discussion of the only other issue presented on appeal which is as to the question of the sufficiency of the evidence to support a conviction.
As to that issue, we cannot properly fore-go a careful analysis of the evidence, particularly the testimony of Kevin M. Wilson, the testimony of the defendant, and the statement made by defendant to investigating officers and recorded on a tape, of which a transcribed copy is before us on appeal.
Kevin Wilson testified that on an afternoon in October 1981, the appellant came by Kevin’s house in a motor vehicle and picked Kevin up and drove him to Perry’s Barbecue, after the appellant’s relating to Kevin the fact that his mother wanted to see Kevin “about a job.” We quote some material parts of Kevin’s testimony:
“A. Yeah, we had a conversation. He was telling me his mom wanted to see me about a job.
“Q. And, did he tell you anything else that day?
“A. We just went and met his mom.
“Q. Okay. Did he say anything else to you when he picked you up, besides his mama wanted to see you about a job?
“A. That was about it.
“Q. What, if anything, is the next thing that you did after he told you that?
“A. We went to see his mom.
“Q. Where was she?
“A. She was at that restaurant.
“Q. Okay. Was she inside or outside when you first—
“A. I don’t know. When I was there, we sat down and she came up and he introduced us, and, you know—
[[Image here]]
“Q. Who all was present when you first saw Madge [defendant’s mother]?
“A. Rick and Kathy and Madge and me.
“Q. Now, who is Kathy?
“A. That is Rick’s [appellant’s] wife.
“Q. And, did Madge sit down at the booth with you?
“A. Yeah, she sat across from me.
“Q. Okay. Did you have a conversation at that time with Madge and with Rickie?
“A, No, it was kind of quiet at first. They got up to play pinball or something. Anyway, she sat there and just started going into detail about what she wanted.
[[Image here]]
“A. It was Rick, Kathy, and me, and his mom, but then they got up and left and just left me and his mother there talking.
[[Image here]]
“Q. [By counsel for the State]: Just tell the ladies and gentlemen of the jury *1344 what your conversation was with Madge at that time?
“A. Well, they wanted me to knock him off.
“Q. Okay.
“A. She wanted it done right. She wanted to tell me what a butt hole he was. Excuse me. Just how miserable her life was and she was about — she worked so long for everything, and she was just about to lose all of it.”
The witness continued his testimony by making it clear that" defendant’s mother definitely and positively wanted the witness to arrange for the killing of her husband. His testimony then continued as follows:
“Q. Now, how long were you talking with Madge?
“A. A while. I don’t know how long, but it was a while.
“Q. Now, did Rickie and Kathy come back to the table?
“A. Yes.
“Q. And, were y’all discussing, at that time, the job that she wanted you to do?
“A. No, she got quiet then. We didn’t talk about it any more when they came back over.
[[Image here]]
“Q. [By counsel for the State]: What did she tell you about during that conversation at Perry’s Barbecue about the pri- or attempts.”
Kevin Wilson made it clear throughout his testimony that defendant did not expressly “solicit, request, command or importune” Kevin Wilson to kill Henry Reaid, that this was done by Madge Reaid solely, out of the presence of the defendant. Defendant made it clear by his testimony on direct examination that no such solicitation, request, command or importunity was expressed by him to Kevin Wilson. For its contention that the evidence was sufficient to support the verdict finding defendant guilty, appellee apparently relies, as it apparently did on the trial, upon the cross-examination of defendant, and upon a written statement he made to law enforcement authorities after the death of Henry Reaid. It is readily understandable that the prosecution looked upon his statement as an incriminating one, and defendant himself, during his cross-examination, when questioned about the statement, referred to it as an incriminating statement, when he said: “Sir, I didn’t intend to incriminate myself when I gave that statement. I did intend to incriminate my mother and my brother.” Unquestionably, the statement is of a highly incriminating nature in that it incriminates the appellant as to knowledge of the fact that his mother and his brother planned to kill defendant’s stepfather and that by affirmative action on defendant’s part, which he failed to take, he could have prevented it. However, whether it constitutes evidence of criminal solicitation beggars a categorical answer without a careful consideration of the claimed incriminating part of defendant’s testimony on cross-examination and of the statement he made to the officers soon after the death of his stepfather. We now refer to parts of said testimony and such statement of defendant that would seem to come closer to evidence incriminating defendant than other parts of said testimony and such statement. During cross-examination, the defendant testified:
“Q. How many people did you tell the Sheriff back on July 6th, the day after your step-father’s funeral — how many people did you tell the Sheriff that you had contacted about killing Henry?
“A. Only one other.
“Q. So, two all total, is that correct?
“A. That is what I told him.
“Q. And, one of those was Jimmy Berry and the other one was Kevin Wilson, is that correct?
“A. That’s true.
[[Image here]]
“Q. But when Sheriff Roden asked you what did you tell Kevin, I just told him that Mama wanted to talk to him, that she had a job for him to do. And, he asked you what was that job, and you said, mainly of the murder of Henry. Is that what you told Mr. Roden that morning?
“A. Yes, sir, that is what I told him.
*1345 “Q. But now you say that is not how it is, is that correct?
“A. That is right.”
We now turn to the most nearly incriminating part of defendant’s statement that he made to Sheriff Roden:
“Q. What did you tell Earl [otherwise identified as Kevin Wilson]?
“A. I just told him that Mama wanted to talk to him that she had a job for him to do.
“Q. What was that job?
“A. Mainly of the murder of Henry.
[[Image here]]
“Q. Tell me the conversation that you and Earl Wilson had.
“A. I just told you the only thing that I said to him was that Mama had a job that she wanted him to take care of.
“Q. That was to kill Henry Reaid?
“A. Right, other than that I never had any other conversation with him.
“Q. That was the summer of ’81?
“A. Yes.
“Q. Has it been discussed with you any more since then?
“A. No I’ve washed my hands from it for over a year now. I told Mama and my brother both that if they did it they’d get caught. I wanted no part of it.
“Q. How long has the planning that you know of of the murder of Henry Reaid been going on?
“A. Ever since late ’79.
“Q. And only two other people that you contacted about killing Henry Reaid was Jim Berry and Earl Wilson. Is that right?
“A. That’s right.
“Q. Is that right?
“A. That’s true.
“Q. Rickie, is there anything else that you need to tell me about this murder?
“A. Not that I can think of. I suspected that maybe Greg had done it because the way he was acting up at the funeral home. I should have said something.
“Q. How many tries have your mother and your brother Greg, and your mother, Madge, do you know how many people that have been contacted about killing Henry?
“A. Just the two that I told you, that’s all.
[[Image here]]
We can readily see a reasonable basis for the contention that what we have quoted above when considered with the other circumstances set forth above tended at least to constitute self-incrimination by defendant of the crime of criminal solicitation of Kevin Wilson by defendant’s mother, but, in our opinion, such a conclusion is not compelled. On the other hand, we see a basis for a reasonable conclusion that none of what he said constituted a refutation of what he and Kevin Wilson had otherwise said in their testimony to the effect that appellant did not solicit, request, command or importune Kevin Wilson to kill Henry Reaid.
It should be made clear that however valuable to the prosecution or to the defense may have been the testimony of defendant as to the solicitation by defendant in 1979 of a person other than Kevin Wilson to kill Henry Reaid, it would have no legal bearing upon the charge that he solicited Kevin Wilson for that purpose. Furthermore, it should be noted that in 1979 there was no such crime in Alabama as criminal solicitation, not until January 1, 1980.
Even if a jury issue was presented as to defendant’s guilt of criminal solicitation, we are persuaded that the weight of the evidence is not in favor of the State as to the guilt of appellant of criminal solicitation.
“The rule is well settled in this State that a verdict of conviction will not be set aside on the ground of the sufficiency of the evidence to sustain the conviction, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it was wrong and unjust. Cobb v. Malone, 92 Ala. 630, 9 So. 738; Stewart v. State, 38 Ala.App. 365, 84 So.2d 658; Evans v. State, 39 Ala.App. 404, 103 So.2d 40, cert. denied, 267 Ala. *1346 695, 103 So.2d 44; Jones v. State, 40 Ala.App. 419, 114 So.2d 575.” Bridges v. State, 284 Ala. 412, 225 So.2d 821 (1969)
The principle of law just quoted has been consistently followed in Alabama. Johnson v. State, 378 So.2d 1164 (Ala.Cr.App.1979). In accordance with such principle, we conclude that defendant’s motion for a new trial on the ground, inter alia, that the verdict was strongly against the weight of the evidence should have been granted and that the trial court was in error in overruling the defendant’s motion for a new trial. Any reluctance in so deciding by reason of Rule 45B, A.R.A.P., precluding our consideration, except in those cases in which the death penalty has been imposed, of questions or issues not presented in briefs on appeal, is dissipated by the pronouncement of Chief Justice Torbert, with the concurrence of all associate justices, in Ex Parte State (Re: Hoppins v. State) 436 So.2d 29 (Ala.1983) that Rule 45B was not intended “to restrict the authority of the Court of Criminal Appeals to consider obvious errors.” Furthermore, we believe that, although the ruling of the trial court is not precisely and specifically made an issue in appellant’s brief, such issue is embraced within the expressly asserted ground in appellant’s brief of an “insufficiency of the evidence to support a conviction,” and the argument in appellant’s brief pertaining to such ground.
The judgment of the trial court should be reversed by reason of its denial of defendant’s motion for a new trial and the case remanded for another trial. We make no determination at this time to the effect that a jury issue as to defendant’s guilt was not presented by the evidence.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
REVERSED AND REMANDED.
All the Judges concur, except BOWEN, J., who dissents.